**MATTHEW J., et al.**

v.

**MASSACHUSETTS DEPARTMENT OF EDUCATION, et al.**

No. Civ.A. 94–30172–MAP.

United States District Court, D. Massachusetts.

Jan. 5, 1998.

Stewart T. Graham, Jr., Hampden, MA, for plaintiffs.

Rosemary Tarantino, Asst. Atty. General, Office of Attorney General, Springfield, MA, Cynthia J. Gagne, Attorney General's Office, Springfield, MA, for Massachusetts Department of Education, defendant.

Peter L. Smith, Paroshinsky Law Offices, Springfield, MA, for School Committee of the Town of Granville, Massachusetts.

## MEMORANDUM REGARDING CROSS–MOTIONS FOR SUMMARY JUDGMENT[1]

PONSOR, District Judge.

### I. INTRODUCTION

This is an appeal from a decision of the Bureau of Special Education Appeals ("BSEA") of the defendant Massachusetts Department of Education ("Department" or "DOE"). The BSEA decision concluded that plaintiff, Matthew J., and his parents were entitled to reimbursement for certain special educational costs, due to the failure of the defendant School Committee of the Town of Granville, Massachusetts ("Granville") to offer Matthew a proper special education program for the years 1988 through 1992.

The BSEA hearing officer declined, however, to find that the plaintiffs were entitled to reimbursement of tuition costs paid by them after they placed Matthew in a private school. The hearing officer concluded that the school offered no special education programs and did not conform either to the requirements of the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. §§ 1400 et seq., or to state regulations. The BSEA's decision also stated that both the Establishment Clause of the First Amendment to the United States Constitution and Article 46, § 2 of the Massachusetts Constitution (the "Anti-aid Amendment") forbade reimbursement of tuition expenses for attendance at the private school because it offered a sectarian Christian education. The plaintiff brought this action to obtain review of the BSEA decision. After some preliminaries, both sides filed what the court has construed as motions for summary judgment. See, note 1.

The court referred the parties' motions to Magistrate Judge Kenneth P. Neiman, and on March 10, 1997 he issued his Report and Recommendation to the effect that the BSEA decision should be upheld, in part. Specifically, the Magistrate Judge found that the BSEA officer was correct in concluding that tuition reimbursement would be inappropriate for the last three of the four years of Matthew's secondary education, because Matthew's placement in the private school was not proper under the IDEA, and because such reimbursement would violate the First Amendment and Article 46, § 2 of the Massachusetts Constitution.

With regard to the first year of Matthew's secondary education (1988–89), however, the Magistrate Judge found that Granville's utter failure to provide any educational services for Matthew, or even to draft an Individual Education Plan ("IEP") for him, justified the court's exercise of its equitable power to require the defendants to reimburse plaintiffs for their tuition payments for that year.

Plaintiffs have objected to the Report and Recommendation, contending that a fair review of the record requires the defendants to reimburse plaintiffs for all four of Matthew's secondary years. Defendants also have objected, contending that the Magistrate Judge should not have ordered them to pay for even one year. They argue that this equitable award constituted an improper imposition of punitive damages.

For the reasons set forth in detail below, the court will decline to adopt the Magistrate Judge's Recommendation and will order that defendants reimburse the plaintiffs for all four years of tuition at the private school. In summary, the record clearly reveals that (1) the school system's abdication of its responsibilities under the IDEA left Matthew's parents with no practical alternative to the private school, (2) the private school (though not formally a "special education" facility) provided Matthew with an environment and a program that effectively addressed his special needs, and (3) the school system itself designated the private school as Matthew's educational provider even while refusing to reimburse the tuition costs or propose any practical alternative. Finally, decisions of both the United States Supreme Court and the Massachusetts Supreme Judicial Court establish that the private school's sectarian identification does not bar tuition reimburse-

---

1. As a formal matter, this case is an appeal of the administrative decision below. However, the Magistrate Judge has treated the parties' submissions as cross-motions for summary judgment.

For purposes of consistency, and without objection from any party, this court has continued to treat counsels' submissions in this format.

ment to the parents under these circumstances.

## II. FACTUAL BACKGROUND

The facts set forth below are primarily drawn from Magistrate Judge Neiman's statement of the facts, occasionally supplemented from the voluminous underlying record.

Matthew attended the Granville Public Schools from kindergarten through eighth grade, the 1987–88 school year, with the exception of his fourth grade when he attended a private school called the Master's School. Granville provided him with special education services during the fifth through eighth grades pursuant to an Individual Educational Plan ("IEP") using a prototype placement promulgated under 603 C.M.R. § 28.502.2 & .502.3.[2] These two regulations govern special education programs with no more than 25% and 60% of time outside regular educational programming, respectively.

Matthew's principal diagnosis was "Schizotypical Personality Disorder." This illness manifested itself as excessive social anxiety, magical thinking, poor internal controls and inappropriate affect. These problems, in turn, led to difficulties in school and Matthew's consequent need for special education services.

During the seventh grade, Matthew's "TEAM" reconvened to discuss Matthew's placement. Under Massachusetts law, the "TEAM" refers to a group of professionals who develop, review and revise the provisions of an IEP, including placement options. *See* 603 C.M.R. § 28.322.0. A similar group is required under federal law. *See* 34 C.F.R. §§ 300.343 *et seq.* By March 1987, the TEAM concluded that Matthew required an out of district program, that Granville's school program was not appropriate for him, and that Granville would temporarily service him until an out of district placement was obtained.

In February 1988, Matthew's parents exercised their right to obtain an independent evaluation by an approved facility, pursuant to Mass.Gen.Laws ch. 71B, § 3; 603 C.M.R. § 28.328.0. This evaluation by Newington Children's Hospital ("Newington"), referred to as the "PEDAL" evaluation, concluded, among other things, that Matthew's educational placement required appropriate peers who were not overly aggressive, since Matthew was at risk of being victimized or otherwise traumatized.[3]

Because Matthew had had a positive peer experience at the Master's School, his parents began considering whether this would be an appropriate placement. Master's is a college preparatory school for grades one through twelve, offering high school students a 12:1 student/teacher ratio, and providing individual attention and a supportive environment. The school is a Christian school; it integrates Christian philosophy and doctrine throughout the school day.

Although Master's does not explicitly offer special education services, the services it does provide were responsive to Matthew's

---

**2.** Under 603 C.M.R. § 28.322, each IEP is required to state both the placement, § 28.322.0, which refers to the school or site where services will occur, and the prototype, § 28.322.22, which is the vehicle through which the child's educational program is to be provided. *See* 603 C.M.R. § 28.500.0–.500. (listing Program Prototypes).

**3.** The PEDAL evaluation recommended "1) ... [T]hat Matthew continue with individual therapy which can maintain if not improve his capacity to relate. 2) The challenges which Matthew presents to the family are such that consideration of family therapy would be appropriate. 3) In light of this composite profile, it is strongly advised that Matthew's classes be carefully selected within a structured and supportive environment which can provide compensatory strategies and classroom modifications. Additionally, Matthew would benefit from continued resource room intervention specifically for phonics, spelling, written expression and study/organizational skills. 4) Direct individual language therapy on a twice weekly basis will also be appropriate to address the deficiencies noted. 5) Within the context of language therapy, a small group encounter once weekly to address pragmatic capabilities would be appropriate. 6) Pragmatic skills should be addressed via a small group on a weekly basis. 7) The speech and language pathologist must consult to the core curriculum for purposes of reinforcement and carryover. 8) A re-evaluation of speech and language skills is recommended in one year. 9) Motor deficits should be addressed through direct occupational therapy for pre-vocational and daily living functioning."

needs. Specifically, the 12:1 student/teacher ratio provided the structured and supportive environment and the "appropriate peers" the PEDAL evaluation recommended. Further, the services Master's provided, though not special education, had presumably responded to Matthew's special needs adequately during the fourth grade.

In February 1987, the Granville Special Needs Coordinator notified the parents that the Master's School was not a possible placement due to its non-Chapter 766 status.[4] The school did not explain what it meant by "non-Chapter 766 status." Granville may have assumed that because Master's was a parochial school it could not get the Department's approval to enter into an agreement pursuant to Mass.Gen.Laws ch. 71B, § 4. There is no evidence indicating that the school committee ever made a request for approval of Master's as a placement for Matthew at this time.

During the 1987–88 eighth grade year, the parents and Granville attempted to determine an appropriate out of district special education placement for Matthew. Granville first proposed a "behavior based" program for September 1987.[5] The parents initially accepted this IEP, but, after Matthew's attendance the first day, they became disenchanted and rejected it. It is unclear from the record why the parents made this decision. However, the BSEA hearing officer found that the parents felt the change in the teacher and the students rendered it inappropriate.[6]

In December 1987, Granville developed an interim IEP with a 502.3 prototype placement and, shortly thereafter, requested a BSEA hearing to resolve the dispute regarding the placement. In April 1988, the parties entered into mediation, eventually resolving their dispute by a settlement agreement. Pursuant to the agreement, the parties agreed (1) that Matthew would remain in the public school's special education program with mainstreaming, (2) that an individual aide, resource room services, psychological counseling and psychological consulting would be provided, and (3) that Granville would seek a 502.5 "Day school program," prototype placement, out of the district, for the 1988–1989 school year.[7]

Granville failed to implement the mediation agreement. It did not carry out the terms of the IEP as modified by the agreement, and failed to seek a section 502.5 out of district prototype placement. In fact, no TEAM meeting was ever convened to develop the section 502.5 prototype for the 1988–89 school year. Granville did, however, make attempts to pursue some private school possibilities and, in June 1988, suggested several out-of-district alternatives. The town urged the parents to let Granville know if they were

---

4. Mass.Gen.Laws ch. 71B, §§ 1 *et seq.*, Children with Special Needs, is commonly referred to as "Chapter 766" because Chapter 766 of the Acts of 1972 created the Special Needs statute.

5. It is unclear from the record what a "behavior-based" program is.

6. As noted below, an LEA is not required simply to accept the parents' decision rejecting a placement. Procedures exist to resolve disagreements; these were not, however, invoked by Granville in response to the rejection of the "behavior based" program.

7. 603 C.M.R. § 28.502.5. Subsection .502.5 requires:

Each school committee shall arrange for the provision of programs within this prototype to each child in need of special education only when the nature or severity of the special need is such that education in a less restrictive environment with the use of supplementary aids

and services cannot be achieved satisfactorily. Programs within this prototype shall have the following characteristics:
(a) The child shall be placed in a program at a facility other than a public school regular education facility.
(1) The child's program shall have a duration of at least five hours each day unless the TEAM states that a different duration is necessary to meet the child's special needs. In such case, the TEAM shall state on the IEP the reason for such duration.
(2) The site of the program shall be within one hour traveling time, one way, from the child's home; provided, however, that where the TEAM determines that a longer traveling time may be necessary it shall so specify as part of the transportation plan on the child's IEP.
(b) Each school committee shall arrange for the provision of all programs within this prototype through the procedures described in 603 C.M.R. 28.504.0.
603 C.M.R. § 28.502.5.

interested in any of the suggested special education schools so that the TEAM could write the IEP. The parents then provided the permission necessary to send materials regarding Matthew to the list of special education schools.

These efforts notwithstanding, the fact remains that Granville did not suggest a program the parents could consider and agree to, and Granville failed to develop any IEP for the 1988–89 school year. For various reasons, Matthew was not placed at any of the several possible special education schools whose names were suggested by Granville. In the interest of trying to achieve an amicable compliance with the mediated agreement, the parents did not request a BSEA hearing at this time.

In September 1988, having been offered *no* placement for their son, Matthew's parents unilaterally placed Matthew at the Master's School in West Simsbury, Connecticut. The parents requested that the Granville school committee fund the Master's placement, given that this was the only school the parents could find for Matthew. They also informed the Granville school committee, in writing, that Granville had failed to provide any TEAM meeting or IEP for Matthew's 1988–89 school year.

In February 1989, the parents again requested a TEAM meeting for Matthew. In April 1989, Granville's special education director, George Clark, visited the Master's School and reported the nature of the facility—a small, Christian college preparatory school, providing no explicit special education services—to Granville's Superintendent. Granville did not pay for the Master's tuition and provided no special education services at all to Matthew for the 1988–89 school year.

In June 1989, Granville convened a meeting to discuss the parents' request for services for the 1989–90 school year. The parents expressed their dissatisfaction with Granville's failure to provide for Matthew's special education needs. In their view, they had been left to their own resources after pursuing many suggested placements and finding none of them appropriate for Matthew. Although they recognized that Master's did not address Matthew's disabilities

through any explicitly denominated "special education" program, they asserted that the school did provide an appropriate environment and program for Matthew. Drawing on the Newington evaluation, Matthew's parents stated that they wanted an educational program that would incorporate the Master's School, supplemented with a learning disabilities teacher, speech services, occupational therapy, and counseling.

In August 1989, Granville notified the parents that the Newington evaluation needed to be updated in order for the TEAM to have sufficient information to develop the 1989–90 IEP. Significantly, the TEAM also stated that placement at Master's could not be funded until other options "approved by Chapter 766" had been pursued, as per the direction of the Department of Education. Although the parents refused to agree to the updated evaluation, they consented to a different kind of evaluation, called a Woodcock educational assessment. A TEAM meeting was finally convened in November 1989.

In December 1989, Granville promulgated a November 1989–November 1990 IEP, calling for a prototype out of district placement under 603 C.M.R. § 28.502.5, at a location "to be determined." This IEP called for a learning disabilities ("LD") tutor twice a week, an LD tutor and counselor consultation once a month, speech therapy one and one-half hours each week, occupational therapy once a week, and counseling one hour every other week. This IEP, as amended in March 1990, was accepted by the parents, with certain peripheral conditions. In fact, no LD tutor was provided until April 1990, despite the understanding that mutually-accepted elements of the IEP would be implemented immediately. The notice accompanying the IEP explicitly stated this, and the regulations require that "[t]he school committee shall immediately implement the mutually accepted elements of the IEP." 603 C.M.R. § 28.325.2.

Matthew attended Master's for his tenth grade, 1989–90 school year, and eventually received some of the special education services set out in the IEP. Granville, however, refused to pay Master's tuition and did not

provide the occupational therapist. In June 1990, Granville scheduled TEAM meetings and an August 1990–June 1991 IEP was issued, again calling for a section 502.5 prototype placement at a location "to be determined." A month later the IEP was amended and the location specified was Master's. Although the inclusion of Master's in the IEP would appear to be a significant event, the record and counsel's briefs lack any discussion concerning why Master's was listed on the IEP or the significance of its selection.

The specification of Master's as the location for Matthew's services can only suggest that the school system, in some sense, agreed that Master's was an appropriate placement. This inference is supported by the record. As early as April 1990, Granville told the parents that although it would not supersede the DOE, it "agreed and still agrees to fund Matthew's program at Masters and to provide retroactive reimbursement for the same contingent *upon DOE approval*." [8]

Two weeks after the IEP meeting that specified Master's as the program location, the Granville School Committee made an offer of settlement that included $8,661.10 for costs incurred at the Master's school for the 1988–89 school year, an offer to seek retroactive sole source approval and reimbursement for a portion of the 1989–90 school year and an offer to seek approval for the upcoming year at Master's. Although, of course, evidence of this sort is inadmissible under Fed. R.Evid. 408 to establish the validity of plaintiff's claim, the offer does tend to undermine defendant's position on the separate issue of whether designation of Master's as a service provider was a legal impossibility.

The parents accepted Matthew's IEP on September 23, 1990. Shortly thereafter, following the TEAM meeting, Matthew's psychiatrist wrote Granville concerning an appropriate placement for Matthew. No only did the psychiatrist inform Granville that any change in placement would be dangerous to

Matthew's health, and could trigger hospitalization, but he specified that the placement at Master's *met Matthew's clinical needs*. He recommended, therefore, that Matthew remain there.

Matthew attended Master's for the 1990–91 eleventh grade, and Granville provided the tutoring, speech therapy, and counseling required by the IEP. Again, Granville refused to pay for Master's tuition. The parents, for their part, declined the speech and language services.

In March 1991, Granville convened a TEAM to develop Matthew's 1991–92 IEP, prototype placement. Significantly, Master's was listed as the placement location, although later this IEP was amended leaving the prototype and location blank. [9] Again, the record is bereft of any evidence about why Master's was initially listed as the placement location. The court can only assume that Master's was included because the TEAM considered it, in some sense, an appropriate placement.

In 1991–92, Matthew attended his twelfth grade at Master's. Granville again provided the ancillary special education services, but refused to pay for the Master's tuition.

Throughout Matthew's high school years at Master's, the parents considered many Chapter 766 approved schools obtained from lists given to them by Granville and through their own sources. Matthew was rejected by many of the schools, and the parents themselves rejected many of the schools as having inappropriate peers with aggressive behaviors, or as being residential schools they did not think were appropriate for Matthew.

Of course, the school committee was not required simply to accept the parents' decision. As the school committee had done in October 1987, when Matthew's parents rejected a placement, it could have requested a hearing to resolve the dispute. After 1987, Granville never attempted to challenge the parents' placement decision. Instead, Granville led the parents to believe that it was

8. Letter from Granville's Attorney to the J's Attorney, April 18, 1990 (emphasis in original).

9. The parents did not sign the March 7, 1991 IEP that listed Master's as the placement location, but did sign the November 15, 1991 IEP that listed "no designation." It is unclear from the record why the first IEP was not signed.

seeking referral for Matthew's schooling at the Master's school.[10]

Matthew's performance at Master's was successful in the sense that he did well enough to graduate. However, his performance was varied. During the ninth grade, he made acceptable academic progress, but had great difficulty in making friends and was susceptible to being victimized or to victimizing younger students. Matthew's tenth grade progress reports indicate that he made social gains, felt comfortable, and that he made very good academic gains. His eleventh grade reports indicate more limited progress. His third quarter grades consisted of two Cs, three Ds and one F. The specialists working with Matthew expressed the need to integrate their services throughout his curriculum. The record is silent as to his twelfth grade performance at Master's.

## III. STATUTORY FRAMEWORK

■ Under the Individuals with Disabilities Education Act[11] "IDEA"), Pub.L. No. 91–230, 84 Stat. 175 (codified as amended at 20 U.S.C. §§ 1400 *et seq.* (1990 & Supp. 1997)), to receive federal funding, States are required to provide children with a "free appropriate public education" ("FAPE") in the least restrictive environment. 20 U.S.C. § 1401(a)(18).[12] Eligible students with disabilities receive services through the IDEA's requirement of an individual education plan ("IEP"). 20 U.S.C. § 1401(a)(19). Under the IDEA, an IEP must be developed before special education services can be provided. 34 C.F.R. § 300.342 (1997). Further, the responsibility for developing the IEP is placed on the Local Education Agency

("LEA"), 20 U.S.C. § 1401(a)(19). Parental participation in the IEP is essential to its validity under the IDEA. *See e.g., W.G. v. Board of Trustees,* 789 F.Supp. 1070, 1072 (D.Mont.1991), *aff'd* 960 F.2d 1479 (9th Cir. 1992).

Normally, a child's FAPE is met, through an IEP, by education in the public schools or, where the public schools do not provide adequate services, in a private school chosen by school officials and the child's parents. *Florence County Sch. Dist. Four v. Carter,* 510 U.S. 7, 12, 114 S.Ct. 361, 364, 126 L.Ed.2d 284 (1993). Predictably, school officials and parents do not always agree on the child's IEP, or on a child's placement. Thus, the Supreme Court in *School Comm. of Burlington, Massachusetts v. Department of Ed.,* 471 U.S. 359, 105 S.Ct. 1996, 85 L.Ed.2d 385 (1985), held that the IDEA grants authority to courts to order school authorities to reimburse parents who unilaterally place their child in a private school where the court "ultimately determines that such placement, rather than a proposed IEP, is proper under the Act." *Burlington,* 471 U.S. at 369, 105 S.Ct. at 2002. However, parents who unilaterally change the child's placement while they challenge a proposed IEP, bear the risk that the court may determine that the placement is not proper. *Id.* at 373–74, 105 S.Ct. at 2004–05.

Under the IDEA, for a placement to be considered a FAPE, it must be provided at public expense, meet the standards of the State Education Agency, include appropriate education and unfold in conformity with the IEP. 20 U.S.C. § 1401(a)(18). However, in

---

**10.** Under 28 C.M.R. § 28.400.0, any party can request a hearing or mediation to resolve differences of opinion regarding the "identification, evaluation, placement, proposed educational placement, or the provision of a free appropriate public education to special needs children, the Bureau of Special Education Appeals shall conduct mediations and hearings to resolve such disputes at the request of parents and school committees." *Id.*

**11.** The IDEA was originally titled the Education for All Handicapped Children Act, but was amended in 1990. Education of the Handicapped Act Amendments of 1990, Pub.L. No. 101–476, 104 Stat. 1103 (1990).

**12.** The IDEA defines free appropriate public education as special education and related services that —

  (A) have been provided at public expense, under public supervision and direction, and without charge,

  (B) meet the standards of the State educational agency,

  (C) include an appropriate preschool, elementary, or secondary school education in the State involved, and

  (D) are provided in conformity with the individualized education program required under section 1414(a)(5) of this title.

20 U.S.C. § 1401(a)(18).

*Florence,* the Court considered whether parents were barred from reimbursement because the private school they enrolled their child in did not meet the requirements of a FAPE as set forth in 20 U.S.C. § 1401(a)(18). *Florence,* 510 U.S. at 13, 114 S.Ct. at 365.

■ The Court held that the school district's proposed educational program was inadequate and failed to satisfy the requirements of the IDEA. *Id.* at 10, 114 S.Ct. at 363. Although the school was not an the approved list of private special education schools and did not meet all of the requirements of a FAPE, it was adequate under the Act because it "allowed [the child] to receive passing marks and progress from grade to grade." *Id.* at 11, 114 S.Ct. at 364. The Supreme Court agreed with the 4th Circuit Court of Appeals that "it hardly seems consistent with the Act's goals to forbid parents from educating their child at a school that provides an appropriate education simply because that school lacks the stamp of approval of the same public school system that failed to meet the child's needs in the first place." *Id.* at 14, 114 S.Ct. at 365 (quoting *Carter By and Through Carter v. Florence County Sch. Dist. Four,* 950 F.2d 156, 164 (4th Cir.1991). Thus, the requirements of a FAPE in section 1401(a)(18) do not apply to parental placements that are otherwise proper under the IDEA, because to hold differently would be to eliminate the right of unilateral withdrawal recognized in *Burlington,* 471 U.S. at 373, 105 S.Ct. at 2004. *Florence,* 510 U.S. at 13, 114 S.Ct. at 365.

Fundamental to the goal of assuring that "all children with disabilities have available a free appropriate public education," are the procedural safeguards of 20 U.S.C. § 1415. Under this section, the State Educational Agency shall establish and maintain procedures that provide:

written prior notice to the parents or guardian of the child whenever such agency or unit—

(i) proposes to initiate or change, or

(ii) refuses to initiate or change, the identification, evaluation, or educational placement of the child or the provision of a free appropriate public education to the child . . . .

20 U.S.C. § 1415(b)(1)(C)(i)–(ii). Further, once a complaint has been made, the parents must be afforded an impartial due process hearing. 20 U.S.C. § 1415(b)(2). Any party, parent or LEA, aggrieved by a decision of the hearing officer may appeal to the State Education Agency and eventually may appeal to any State court of competent jurisdiction or district court of the United States without regard to the amount in controversy. 20 U.S.C. § 1415(e)(2). During the pendency of these proceedings, the IDEA mandates that a child receiving services but challenging the services granted "shall remain in the then current educational placement." 20 U.S.C. § 1415(e)(3)(A). Although the IDEA dictates stringent procedural safeguards, the details of these safeguards are left largely to the States.[13]

Consistent with the IDEA, the Massachusetts' special education statute,[14] and the regulations promulgated thereunder,[15] place responsibility on the school committee to notify parents whenever the school committee "proposes or refuses to initiate or change the identification, evaluation, or educational placement or the provision of a free appropriate public education to the child." 603 C.M.R. § 28.317.1. Further, the school committee is responsible for notifying the Bureau of Special Education Appeals "no later than five days after" a parent rejects an IEP or a finding of no special needs, or where a parent requests a hearing. 603 C.M.R. § 28.400.1. After the school committee has sent the parents the IEP or statement of no special needs, the parents have thirty days to respond.[16] 603 C.M.R. § 325.1. Additionally,

---

13. *See* 34 C.F.R. § 300.500–.515 for the due process procedures for parents and children. Under these regulations, parents and children are given the right to notice, a hearing and attorney's fees when successful.

14. Mass.Gen.Laws ch. 71B, §§ 1 *et seq.*

15. 603 C.M.R. §§ 28.00 *et seq.*

16. The regulations give the parents five options: (a) To accept or reject the IEP in whole or in part or to accept or reject the finding that the child does not need special education. (b) To request a meeting with the Administrator of Special Education to discuss the rejected

mutually agreed upon elements of the IEP shall be immediately implemented by the school committee. 603 C.M.R. § 325.2.

### III. STANDARD OF REVIEW

Plaintiffs have brought this action under 20 U.S.C. § 1415(e)(2) as parties aggrieved by the findings and decisions of a state educational agency. Pursuant to this provision, "the court shall receive the records of the administrative proceedings, shall hear additional evidence at the request of a party, and, basing its decision on the preponderance of the evidence, shall grant such relief as the court determines is appropriate." 20 U.S.C. § 1415(e)(2); *see also Amann v. Town of Stow*, 991 F.2d 929, 932 (1st Cir.1993).

In determining whether to award relief, a court does not have "an invitation ... to substitute [its] own notions of sound educational policy for those of the school authorities which [it] review[s]." *Board of Educ. v. Rowley*, 458 U.S. 176, 206, 102 S.Ct. 3034, 3050, 73 L.Ed.2d 690 (1982). Rather, a court must give the state administrative proceedings "due weight." *Id. See also Lenn v. Portland Sch. Comm.*, 998 F.2d 1083, 1087 (1st Cir.1993). To accomplish this balance, a court must apply "an intermediate standard of review[,] ... a standard which, because it is characterized by independence of judgment, requires a more critical appraisal of the agency determination than clear-error review entails, but which, nevertheless, falls well short of complete *de novo* review." *Lenn*, 998 F.2d at 1086 (citations omitted). In proceedings under Fed.R.Civ.P. 56 this standard must be applied against the traditional summary judgment litmus. *Norton Sch. Comm. v. Massachusetts Dept. of Educ.*, 768 F.Supp. 900, 904 (D.Mass.1991).

As always, summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c).

### IV. DISCUSSION

The defendants concede that the Granville school committee violated the IDEA during Matthew's freshman, 1988–89, school year by failing to offer him a FADE. However, they maintain that during Matthew's sophomore to senior year they, in good faith, offered him a FAPE by providing a list of acceptable related services and by pursuing a sole-source-of-care-referral to the Master's school. The defendants assert that they should not be required to reimburse the parents even for Matthew's first year because the Master's school was not appropriate under the IDEA. The defendants assert, without specifics, that the Master's school was not an appropriate placement because it did not meet any of the standards evidencing an appropriate placement.

The defendants offer two other grounds for denying the parents reimbursement. First, they contend that equitable consider-

IEP or rejected portion of the IEP and placement pending appeal.
(c) To accept and amend the IEP that has been mutually agreed upon with the Administrator of Special Education and the TEAM in the process provided for under 603 C.M.R. 28.326.0.
(d) To postpone until the completion of the independent evaluation a decision on the IEP or on the finding that the child does not need special education, and to obtain an independent evaluation of their child (specifying whether at their own expense or by an independent evaluator at school committee expense), in accordance with 603 C.M.R. 28.328.0 and .329.0. The right to obtain an independent evaluation at school committee expense shall apply only to those instances in which the parent disagrees with an evaluation

or reevaluation obtained by a school committee and shall be limited to one independent evaluation per evaluation or reevaluation by the school committee.
(e) To reject the IEP in whole or in part or the finding of no special needs and request an independent evaluation of their child (specifying whether at their own expense or by an independent evaluator at school committee expense) in accordance with 603 C.M.R. 28.328.0 and .329.0. The right to obtain an independent evaluation at school committee expense shall apply only to those instances in which the parent disagrees with an evaluation or reevaluation obtained by a school committee and shall be limited to one independent evaluation per evaluation or reevaluation by the school committee.
603 C.M.R. 28.325.1(a)–(e).

ations bar reimbursement. The defendants assert that they acted in good faith and that the failure to find Matthew an appropriate placement was caused largely by the parents' own failure to return forms and authorize necessary evaluations.

Second, the defendants assert that the First Amendment and the "anti-aid" amendment of Massachusetts' Constitution, Articles of Amendment prohibit reimbursement.[17] Essentially, defendants claim that reimbursement to Matthew's parents of tuition paid to a sectarian religious school would improperly undermine the separation of church and state.

The court will address, first, the appropriateness of the Master's School; second, the church/state issue under the United States and Massachusetts constitutions and, finally, the parties' conduct and the appropriateness of equitable relief.

### A. The Master's School

Even giving due weight to the agency proceeding, this court must find that the BSEA conclusion that Matthew's placement at the Master's school was inappropriate under the IDEA, 20 U.S.C. §§ 1401 et seq. and Mass. Gen.Laws ch. 71B, §§ 1 et seq., was not supported by the record. In enacting the IDEA, Congress explicitly intended that the free appropriate public education provided under the Act would be "designed to meet [the child's] unique needs." 20 U.S.C. § 1400(c); Curtis K by Delores K v. Sioux City Community Sch. Dist., 895 F.Supp. 1197, 1205 (N.D.Iowa 1995). The IEP, when properly created, is the tool to address these unique needs. 20 U.S.C. § 1401(a)(19). Although the IDEA mandates that states receiving federal funds provide a free appropriate public education (emphasis added), 20 U.S.C. § 1412(2)(B), the statute itself does not define the term "appropriate"—perhaps to encourage flexibility in the assessment of a child's "unique" needs.

In 1982, in Rowley, 458 U.S. 176, 102 S.Ct. 3034, 73 L.Ed.2d 690, the Supreme Court defined the term "appropriate" as used in the IDEA. The student in that case was a hearing impaired child placed in a regular kindergarten class for a trial period. Id. at 184, 102 S.Ct. at 3039. During this period, a sign-language interpreter accompanied the child. Id. At the IEP for the next year's services, the sign-language interpreter was removed because the interpreter believed that the child's lip reading skills were so good that her services were not needed. Id. The parents insisted that their child be provided a sign-language interpreter.

In affirming the decision of the school to remove the sign-language interpreter, the Court held that "appropriate" means "personalized instruction with sufficient support services to permit the child to benefit educationally" and services that are "reasonably calculated to enable the child to achieve passing marks and advance from grade to grade." Id. at 203–04, 102 S.Ct. at 3049–50. Although subsequent courts have held that under the federal statute this personalized instruction need not be the best available option, see e.g. Lang v. Braintree Sch. Comm., 545 F.Supp. 1221 (D.Mass.1982), Massachusetts courts construing the parallel state statute have required a higher standard: The IEP must assure the child's "maximum possible development in the least restrictive environment." Roland M. v. Concord Sch. Comm., 910 F.2d 983, 987–88 (1st Cir.1990), cert. denied, 499 U.S. 912, 111 S.Ct. 1122, 113 L.Ed.2d 230 (1991) (quoting David D. v. Dartmouth Sch. Comm., 775 F.2d 411, 423 (1st Cir.1985) cert. denied sub nom., Massachusetts Dept. of Educ. v. David D., 475 U.S. 1140, 106 S.Ct. 1790, 90 L.Ed.2d 336 (1986)).

Neither the statutes, nor the decisions construing them hold, or even suggest, that a school must have a program formally designated a "special education" program in order to constitute a proper placement for a student with special needs. Although Master's does not explicitly offer "special education" services, this fact alone is not dispositive. Instead, the court must look to whether the services Master's did provide were appropriately responsive to Matthew's

---

17. Mass. Const. art. 46, § 2.

educational needs.[18]

Although Matthew had other disabilities, his principal diagnosis was "Schizotypical Personality Disorder." For Matthew, this illness manifested itself as excessive social anxiety, magical thinking, poor internal controls and inappropriate affect. Although it is difficult to discern from the record, it appears that this mental illness was the primary contributing factor in his learning difficulties and his consequent need for special education services.

█ When Matthew was in seventh grade, the TEAM determined that an out of district placement was necessary in order to address his unique needs. During fourth grade, Matthew had had a positive experience at the Master's school. Thus, when an out of district placement was required, the parents justifiably suggested the Master's school as an appropriate placement. Despite this prior success, the record indicates that the school district summarily rejected the Master's school as a possible placement because it was not "appropriate."

There is no evidence that the school committee considered Matthew's needs in light of the actual program that Master's offered. In fact, the record clearly indicates that the Master's school *did* address Matthew's needs. The PEDAL evaluation concluded that Matthew's educational placement required appropriate peers who were not "acting out"—*i.e.*, aggressive—students, since due to his mental illness, Matthew was at risk of being victimized or otherwise traumatized. The school committee did not dispute this finding; in fact, in a subsequent IEP the school quoted the evaluation's findings.[19] The environment maintained at Master's obviously addressed Matthew's vulnerability effectively. In fact, Matthew's psychiatrist in-

formed the school that Master's not only met Matthew's psychological needs but that a new placement would endanger his well being.

Putting aside for the moment the First Amendment issue, the court finds that the Master's school was an appropriate placement for Matthew. Specifically, the 12:1 student/teacher ratio provided the structured and supportive environment and the "appropriate peers" the PEDAL evaluation recommended. The services Master's provided responded to Matthew's special needs in that he maintained adequate grades and successfully graduated from high school in four years. *See Board of Educ. v. Rowley*, 458 U.S. 176, 203, 102 S.Ct. 3034, 3049, 73 L.Ed.2d 690 (1982).

Further support for the appropriateness of the Master's school is the fact that the Granville school committee *approved* the facility as the placement location in two IEP's from April, 1990 to April 1992. The significance of this fact cannot be emphasized enough. Not only did the school authorize the Master's school as the location for services, it told the parents that it would seek DOE approval for Master's. The school district cannot now assert that the Master's school was inappropriate under the IDEA. Because Matthew's placement at Masters was "reasonably calculated" to enable Matthew to "receive educational benefits," *Florence*, 510 U.S. at 13, 114 S.Ct. at 365, the court finds that Matthew's placement at the Masters school was appropriate under the Act.

### B. The First Amendment

█ Reimbursement to the parents of their tuition payment to the Master's School would not, under any of the applicable tests, violate the First Amendment.

**18.** This case does not involve a voluntary placement by the parents where an adequate placement was offered by the LEA. *See e.g. K.R. by M.R. v. Anderson Community Sch. Corp.*, 81 F.3d 673, 678 (7th Cir.1996), *judgment vacated, — U.S. —*, 117 S.Ct. 2502, 138 L.Ed.2d 1007 (1996), *aff'd on remand*, 125 F.3d 1017 (7th Cir. 1997). Instead, this case is controlled by the Supreme Court's holding in *Florence County Sch. Dist. Four v. Carter*, 510 U.S. 7, 114 S.Ct. 361, 126 L.Ed.2d 284 (1993), because, like the parents

in *Florence*, Matthew's parents were left with no alternative but to seek a placement for Matthew on their own.

**19.** As noted, the school district did not provide Matthew with an IEP for his freshman year, 1988–89. However, in the next IEP, covering the period of his sophomore year, 1989–90, under "additional information" the conclusion of the PEDAL evaluation was directly quoted.

As the Supreme Court recently noted, its Establishment Clause jurisprudence is in somewhat of a flux. *Agostini v. Felton,* — U.S. —, —, 117 S.Ct. 1997, 2010, 138 L.Ed.2d 391 (1997). In particular, the Court has been re-examining "the criteria used to assess whether aid to religion has an impermissible effect." *Id.* Thus, the Court has eliminated the absolute bar against placing a public employee in a sectarian school. *See Zobrest v. Catalina Foothills Sch. Dist.,* 509 U.S. 1, 13, 113 S.Ct. 2462, 2469, 125 L.Ed.2d 1 (1993). *Zobrest* "impliedly repudiated . . . [the] assumption that the presence of a public employee on private school property creates an impermissible 'symbolic link' between government and religion." *Agostini,* — U.S. at —, 117 S.Ct. at 2011 (citing *Zobrest,* 509 U.S. at 1, 113 S.Ct. at 2462). Moreover, and most importantly, the Court has abandoned the rule "that all government aid that directly aids the educational function of religious schools is invalid." *Agostini,* — U.S. at —, 117 S.Ct. at 2011.

Matthew appears to stand in a position quite similar to the plaintiff in *Witters v. Washington Dept. of Serv. for the Blind,* 474 U.S. 481, 487, 106 S.Ct. 748, 751, 88 L.Ed.2d 846 *reh'g denied,* 475 U.S. 1091, 106 S.Ct. 1485, 89 L.Ed.2d 737 (1986). In that case, the Supreme Court held that tuition reimbursement to a Christian college, pursuant to the state's vocational rehabilitation act, would not advance religion in a way impermissible under the Establishment Clause. *Id.* at 489, 106 S.Ct. at 752. In arriving at this conclusion, the Court reasoned that the Establishment Clause was not violated because the vocational aid funds were " 'made available generally without regard to the sectarian-nonsectarian, or public-nonpublic nature of the institution benefitted.' " *Witters,* 474 U.S. at 487–88, 106 S.Ct. at 751–52 (quoting *Committee for Public Ed. & Religious Liberty v. Nyquist,* 413 U.S. 756, 782, n. 38, 93 S.Ct. 2955, 2970, n.38, 37 L.Ed.2d 948 (1973)).

Similarly, in this case, the aid would go to pay for Matthew's education in a placement the court finds was otherwise appropriate under the IDEA. Obviously, the funds would be paid without regard to Master's sectarian orientation. Further, the placement was made necessary as a last resort due to the school committee's disregard for its responsibilities under the IDEA. As in *Witters,* the aid would go to the parents individually with no intent to finance religious education or activity. *Id.* at 488, 106 S.Ct. at 751. In other words, reimbursement here would not be "one of 'the ingenious plans for channeling state aid to sectarian schools. . . .' " *Witters,* 474 U.S. at 488, 106 S.Ct. at 751 (quoting *Nyquist,* 413 U.S. at 785, 93 S.Ct. at 2971). In short, Master's Christian identity was happenstance, and reimbursement would not offend the Constitution.

### C. The Massachusetts Anti–Aid Amendment[20]

▮ Similarly, with regard to the Commonwealth's anti-aid Amendment, reimbursement of tuition is consistent with *Comm. v. School Comm. of Springfield,* 382 Mass. 665, 417 N.E.2d 408 (1981). In *Springfield,* the Supreme Judicial Court considered whether distribution of funds to parochial schools under Massachusetts' special needs statute, chapter 766, violated the provisions of Mass. Const. art. 46, § 2, the "anti-aid" amendment. *Springfield,* 382 Mass. at 667, 417 N.E.2d 408. The court considered several factors in concluding that Springfield's system of placing 141 special needs students in private school placements, including parochial schools, did not violate the anti-aid amendment of Massachusetts' Constitution. *Id.* at 675, 417 N.E.2d 408.

First, the court considered the purpose of the money. *Id.* at 675, 417 N.E.2d 408. The court held that the "form of the payment is not dispositive on the issue [of] whether the payment is prohibited. . . ." *Id.* at 676–77, 417 N.E.2d 408. Instead, the court looked to the structure of the statutory scheme. Because the statute was structured to authorize private school placements only where an appropriate program was not available within the public school system, the court held that disbursement of public funds under chapter 766 did not violate the anti-aid amendment, since the challenged use of money lacked the

---

**20.** Mass. Const. art. 46, § 2.

purpose of "founding, maintaining or aiding" private schools. *Id.* at 679, 417 N.E.2d 408.

Second, the court considered whether disbursement of public funds under this statute would substantially aid private religious schools. *Id.* Significantly, the court found that placing four percent of the special needs students in these private placements was insufficient to be considered "substantial aid." *Id.* at 680, 417 N.E.2d 408. Furthermore, the court concluded that the benefits under the special needs statute flowed primarily to the individual student and then the public school, and only indirectly to the private school. *Id.*

The SJC's *Springfield* decision controls here. Obviously, the reimbursement of tuition to Matthew's parents would have no purpose or effect of "founding, maintaining or aiding" Master's, any more than the parochial schools in Springfield were aided. Moreover, payment for this single student could hardly be construed as "substantial" assistance to the school.

### D. Use of the Court's Equity Powers

The defendants point out, and the court agrees, that the parents' conduct was not perfect. On several occasions they delayed returning various forms to the school, and declined to permit a reevaluation by Newington for an updated IEP. The record simply does not support, however, any claim that the parents deliberately, or even unintentionally, sabotaged the school's efforts to create or locate an appropriate educational program for Matthew. The bulk of the evidence is directly to the contrary. It was the defendants who dragged their feet, failed to comply with statutes and regulations and declined even to comply with the settlement agreement they themselves had entered into. Like King Lear, the plaintiffs were "more sinn'd against than sinning." William Shakespeare, *King Lear,* act 3, sc. 2 (Peter Alexander ed., Collins (1968) (1951)). The balance of equities emphatically favors the plaintiffs.

More importantly, the defendants' argument, if sustained, would improperly shift the burden of managing the procedure for providing necessary special educational services from the school officials to the parents. The special education regulations give a school system remedies against recalcitrant, unreasonable or manipulative parents. The record does not indicate that these were ever properly invoked by the *defendants.* The Local Education Agency unequivocally bears the responsibility for compliance with the IDEA, not the parents. 20 U.S.C. § 1412(4); *see also Thornock by Baugh v. Boise Indep. Sch. Dist. No. 1,* 115 Idaho 466, 767 P.2d 1241, 1250 (1988) *cert. denied,* 490 U.S. 1068, 109 S.Ct. 2069, 104 L.Ed.2d 634 (1989).

### V. CONCLUSION

For the foregoing reasons the court declines to adopt the Report and Recommendation. The plaintiffs' Motion for Summary Judgment (so construed) will be ALLOWED, *in toto,* and the defendants' motions will be DENIED. The defendants are ordered to tender full reimbursement to the parents of Matthew J. for tuition costs for all four years at the Master's School in addition to the other costs previously ordered. Plaintiffs' counsel may file a claim for attorneys' fees, if appropriate, pursuant to Fed.R.Civ.P. 54(d).

A separate order will issue.