**FRANK S., by his parents
and next friends,**

v.

**SCHOOL COMMITTEE OF THE DEN-NIS–YARMOUTH REGIONAL SCHOOL DISTRICT and Robert Anto-nucci as Commissioner of the Massa-chusetts Department of Education.**

No. 96–10984–RGS.

United States District Court,
D. Massachusetts.

Oct. 2, 1998.

*MEMORANDUM AND ORDER ON
PLAINTIFFS' PETITION FOR
JUDICIAL REVIEW*

STEARNS, District Judge.

Frank S., through his parents, seeks further review of an administrative decision of the Massachusetts Bureau of Special Education (BSEA)[1] relieving the Dennis–Yarmouth Regional School District (District) of financial responsibility for his placement in a residential school during the 1995—1996 academic year. A BSEA Hearing Officer determined that the District's 1995–1996 Individualized Education Plan (IEP), providing Frank with supplemental special education services, satisfied the mandates of both federal and state law. After oral argument, Magistrate Judge Alexander upheld the

---

**1.** The BSEA is an adjudicatory agency of the Massachusetts Department of Education.

BSEA's decision. Appellants argue that the Magistrate Judge applied an incorrect legal standard in reviewing the BSEA's order. They ask that her decision be reversed.

## FACTS

The Magistrate Judge's decision, the Complaint, the BSEA's March 20, 1996 decision, and the administrative record reveal the following facts. The parties agree that Frank is a special needs student within the meaning of the Individuals with Disabilities Education Act (IDEA), 20 U.S.C. § 1401 et seq., and M.G.L. c. 71B. Frank was determined by clinicians at Franciscan Children's Hospital to suffer from Atypical Pervasive Developmental Disorder (PDD). Frank began receiving special education services at John Simpkins Elementary School. Admin. Trans., at 4–61. At Mattacheese Middle School, Frank received special education support in reading, English and social studies. He was mainstreamed for science, math and non-academic courses. Admin. Rec., at 408.

Frank then attended Dennis–Yarmouth High School in a special education supported mainstream program. Frank's ninth grade (1992–1993), tenth grade (1993–1994), and eleventh grade (1994–1995) IEPs utilized a 502.2 prototype.[2] Frank's "student profile" in each of those IEPs reads as follows:

> Frank ... carries a diagnosis of atypical pervasive developmental disorder exhibiting weaknesses in expressive and receptive language and obsessive/compulsive features which can distort teachers' directives. Frank demonstrates language processing problems. Frank also has difficulty with word retrieval. Frank demonstrates distractible behavior and slow

response time. The basis of Frank's difficulty clusters around what could be called a "language learning disability". This has resulted in serious difficulty in processing language at the abstract level. Frank has particular problems with tests requiring expression of abstract or essay information. Frank has difficulty with creative assignments requiring original ideas and expository essays requiring abstract thought and drawing conclusions. He has great anxiety over poor performance. Frank has trouble contributing or gaining information when working in group situations due to difficulties with social pragmatics, attention, confidence and language processing delays which make social communication very difficult for Frank.

It is recommended that Frank be given increased time to process information, that new verbal material be repeated for him at a slow speaking rate, that timed tasks or tests be either eliminated or extra time be allowed for Frank. It is helpful for Frank if he is able to preview new material through the use of outlines. Frank continues to have difficulty in reading comprehension. He has difficulty taking notes and summarizing (identifying main idea and supporting details). Frank's mother has noted that Frank has problems completing homework in a reasonable amount of time due to organizational problems and language delays. Homework may need to be reduced or modified to facilitate timely completion.

Frank demonstrates average intellectual ability (FCI 05/91). Frank needs help in approaching homework assignments. He has difficulty organizing and structuring

---

**2.** The Code of Massachusetts Regulations at 603 CMR 28.502.0 sets out the prototypes within Massachusetts' special education program. The choice of prototypes (502.1 to 502.10) is based on the child's IEP, including the types of services to be provided, the setting for those services (e.g., the percentage of time the student will receive services outside the regular classroom), and the types of service providers required. The prototypical programs range from special education services provided entirely within the regular classroom (502.1), to residential special education schools (502.6), to special education programs for children who reside in facilities maintained by the Massachusetts Departments of Mental Health, Mental Retardation, Public Health and Youth Services (502.10). The prototype and program selected must provide the least restrictive environment consistent with 603 CMR 28.500.0. If a 603 CMR 28.502.4, 502.4(i), 502.5 or 502.6 prototype is designated, the TEAM (the specialists and teachers who together develop the IEP) must explain the basis for the determination that the child could not be served in a less restrictive environment. 603 CMR 28.322.0. Frank's 502.2 classification meant that he could not be removed from the regular classroom to receive instruction during more than 25% of the school day. 602 CMR 502.2(a).

independent study. He tends to spend excessive time on homework, laboring over minor details: this makes homework very stressful. Frank presents some risk of developing significant depression. He tends to set unrealistic expectations for himself. He presents with a somewhat flat affect: facial expression generally remains bland (Neurology report, FCI 05/91). Frank continues to progress each year. It is clear that intense psychic energy is used daily by Frank to maintain high levels of achievement. Additional specific suggestions for aiding Frank's mastery of classroom material are noted on pages 7–10 on the Education Re-evaluation Summary from Franciscan Children's Hospital, 05/91 (see cumulative record). Frank may at times need to seek out a counselor to help him cope with the daily pressures typical of high school.

Admin. Rec., at 304–305, 327, 346–347.

During the eleventh grade, the special services mandated by Frank's IEP included a daily individual content support class designed to improve his language comprehension and inferential learning, a weekly session with a speech/language pathologist for language pragmatics, after-school individual tutoring at the Sylvan Learning Center, and the use of a District-supplied home computer (IBM PS/2) to assist with his homework. Admin. Rec., at 364. The District also employed Dr. David Mishkin to counsel Frank on social functioning and to advise his teachers on strategies for maximizing his development.[3] In a March 20, 1995 evaluation, Dr. Mishkin gave the following assessment of Frank's development.

Frank is now completing 11th grade and continues to make significant progress in many areas. It is clear that his strength resides in the mathematics and science areas and he continues to do well in honors level courses. Overall, in light of his original diagnosis with its attendant poor prognosis, Frank's progress has been nothing short of remarkable. His intense and understandable desire for peer acceptance and greater comfort in the social domain, has previously led him to equate outstanding academic achievement with peer acceptance. This led him to overcommit himself. The liability for getting into these situations remain. While Frank has made monumental gains especially in involvement in extracurricular activities, his problems organizing his time and hierarchically rank ordering his effort become clear as his involvement[s] increase. The opportunity for him to work at a competitive summer job is also extremely important since it can help provide new peer experiences and continue to develop interpersonal skills as well as flexibility in problem solving in new or unfamiliar situations.

Organizational problems are still present and continued input from his teachers and content support teacher are still required along with the tutoring he is receiving from the Sylvan Center. Continued issues of depression as well as other issues identified on the PSI need to be addressed in the neuropsychological and cognitive therapeutic context to assist him in developing the repertoire of coping skills that will facilitate is [sic] movement to a more autonomous role. This process might be facilitated when Frank and his family feel that he is ready to drive a car. Other modifications in content material presentation and homework prorating still are required and this will be reflected in updated IEP's.

He is currently taking the anti-depressant medication Zoloft and this appears to still be needed to assist his overall functioning.

Admin. Rec., at 402.

By this time, all of Frank's academic courses were mainstream classes (including honors courses in algebra, chemistry, statistics and trigonometry). While the content and grading standards of his homework and tests were the same as those of his classmates, Frank was given (as directed by his IEP) additional time to complete these tasks. He attained grades of A and B in all of his courses. Frank's academic progress was interrupted, however, when, against the recommendations of his Dennis–Yarmouth counselors, he insisted on enrolling in an Honors

---

3. Dr. Mishkin, a neuropsychologist, began working with Frank in the ninth grade.

English course.[4] Admin. Trans., at 20, 155–156. Frank was unable, despite accommodations and the assistance of a content support teacher, to perform successfully. Id., at 167. After a few weeks, he withdrew to join a college preparatory level English class, which he completed with a grade of B.[5] Id., at 4–149 to 4–150. At the end of the school year, Frank had a grade point average of 3.28 and a class rank of 28 out of 208 students. Id., at 53. In June of 1995, Frank took the Scholastic Aptitude Test (untimed), scoring 700 in math and 550 in verbal. Frank participated in concert band, jazz band, the chess club, a writer's forum and the drama club. Admin. Rec., at 191–192. Frank was also chosen to play saxophone in the All Cape and Islands Music Festival. Id., at 67.

In March of 1995, the District TEAM met to draft the IEP for Frank's senior year.[6] As in the previous three years, Frank's mother attended the meeting and contributed to the discussion. Mrs. S. asked Meg Lynch, the TEAM member responsible for drafting Frank's IEP, to make some additions. Specifically, Frank's mother wanted a statement included in his profile explaining that he suffered bouts of depression that impeded his learning. Admin. Trans., at 4–93. She also wanted specifications regarding the focus of his after-school tutorials.[7] Id., at 4–93 to 4–94. Finally, Mrs. S. asked whether Frank could participate in the June 1996 graduation ceremony with his peers while remaining at Dennis–Yarmouth for an additional year of "transitioning." Id., at 3–145.[8] Mrs. S. testified that although the school was in favor of a transition plan, school policy did not permit non-graduating students to participate in "end of the year" graduation activities. Id., at 3–146.[9] Frank's parents rejected the District's proposed 1995–1996 IEP and enrolled him for the 1995–1996 school year at the Pine Ridge School in Williston,

---

4. Frank and his mother pressed for his participation in Honors English as Frank wanted to be with friends who had enrolled in the class. Admin. Trans., at 157. (Dr. Mishkin believes that Frank equates academic achievement with peer acceptance. Id., at 4–149.) Although Frank was eligible for Honors English (having earned an A in tenth grade college preparatory English), the District staff believed that the advanced class would prove too stressful for Frank. Id., at 156–157.

5. During the time Frank was enrolled in Honors English, he displayed depressed and defiant behavior and engaged in public masturbation. Admin. Trans., at 4–138. Frank's mother testified that she believed that he did not receive adequate support from Ms. Avery, the content support teacher, to succeed in Honors English. Id., at 3–

131 to 3–135. Ms. Avery testified that Frank refused to cooperate with her. Id., at 167–168.

6. Under Massachusetts law, TEAM is a term of art referring to the specialists and teachers within a school system who develop and review a special needs student's IEP. See 603 C.M.R. § 28.314.0 et seq. Federal law employs similar usage. See 34 C.F.R. § 300.343 et seq.

7. Frank's mother testified that she also requested that he be placed in a driver's education class and that girls be included in his group therapy sessions.

8. Frank testified at the BSEA hearing that he could have pursued the following "transition" schedule at Dennis–Yarmouth.

| 12th grade: | U.S. History, Honors, Pre–Calculus, Concert Band, English 12, Writing Workshop, Health, and 2 Study Halls |
| 12 + 1: | U.S. History (Advanced Placement), Latin I, Calculus (Advanced Placement), Concert Band, 2 Study Halls |
| 12 & 2 | Computer Science (Advanced Placement), Physics (Advanced Placement), Latin II, Concert Band, 2 Study Halls |

There was, however, evidence that Frank objected to remaining at Dennis–Yarmouth after his friends had graduated and proposed taking "transitioning" classes at Cape Cod Community College instead. Admin. Rec., at 3–147. Apparently, the District rejected that option. Id. at 3–148.

9. Formal graduation would have ended Frank's eligibility for Chapter 766 services. In any event, Frank's parents' decision not to include a required American history course in his 1995–1996 class schedule precluded him from graduating in June of 1996.

Vermont.[10]

Plaintiffs appealed the 1995–1996 IEP to the BSEA asking for reimbursement of Frank's 1995–1996 tuition at Pine Ridge. Lindsay Byrne, a BSEA Hearing Officer, held hearings on November 8 and 9, and December 7, 8, and 13, 1995. Ms. Byrne took testimony from Frank S., Frank's parents, Dr. Mishkin, Dr. Barbara Cutler (an autism consultant to Frank's parents), Leslie Scott (a school psychologist at Dennis–Yarmouth), Stuart Lindberg (the supervisor of residential life at the Pine Ridge School), Kathleen Grabowski (a speech language pathologist at New England Medical Center), Meg Lynch (a speech pathologist at Dennis–Yarmouth and Frank's TEAM leader), Nancy Luccock (an English teacher at Dennis–Yarmouth), Sheryl Lerner (a math teacher at Dennis–Yarmouth), Peter Regan (an administrator at Dennis–Yarmouth), Jean Foss (the director of clinical teaching and research at the Pine Ridge School), and Anita Avery (Frank's content support teacher/tutor at Dennis–Yarmouth). The hearings focused on whether Frank's 1995–1996 IEP was reasonably designed to enable Frank to obtain a suitable public education and, if not, whether the residential program offered by the Pine Ridge School was the least restrictive, appropriate educational placement available to Frank, thus requiring the District to reimburse his tuition.

The Hearing Officer took twenty-one hours of testimony, received 485 pages of documentary evidence, and asked for written closing arguments. Apparently, the appellants' written arguments were timely filed, but not received by the Hearing Officer prior to rendering her decision on March 20, 1996. When the error was brought to her attention, the Hearing Officer re-issued her decision, adding only that "[w]ritten closing arguments were received from both parties on March 4, 1996, and the record closed on that date." Admin. Rec., at 52.

Ms. Byrne found that the 1995–1996 (502.2) IEP developed by the District was reasonably calculated to provide Frank the maximum possible educational benefit in the least restrictive setting. Her decision stated that

> Frank made substantial progress socially, behaviorally, and academically in prior high school years in special education supported mainstream programs substantially similar to the one being proposed for the 1995–1996 school year. In previous years Frank achieved grades of A and B in all his regular education courses, including Honors level courses in math and science; participated without assistance in extracurricular activities; maintained a full after school schedule of tutoring, Karate, music lessons and homework; acquired basic conversational and social skills, and made friends. Given the areas of functioning affected by Frank's disability, these achievements represent a remarkable effort and investment by Frank, his service providers and his family. They lead me to conclude that in prior educational programs Frank has made progress commensurate with and, in some cases, exceeding his potential as measured by standardized intelligence tests and previous educational evaluations. There is no reason to think that Frank's progress would not continue in a similar vein in subsequent similar educational programs.

> [T]he proposed 1995–1996 IEP . . . correctly identified Frank's areas of special education need as explained in the Dennis–Yarmouth and outside evaluations. The Team considered and incorporated requests for modifications and services made by the parents. The IEP provides for the least restrictive special education programming possible, while supporting Frank's full participation in the regular education curriculum . . . .

> [T]here is no credible factual evidence to support a residential educational place-

---

**10.** Frank's mother testified that she and her husband had considered placing Frank at a residential school as early as his middle school years, but did not believe that schools for learning disabled children were able to satisfy his academic needs. Admin. Trans., at 3–102 to 3–103.

"I was very frustrated because the schools that were protective enough that I felt comfortable placing him in wouldn't meet his needs academically, and the schools that met his needs academically didn't have the emotional support component that he needed." Id., at 3–110.

ment for Frank, as advocated by the parents.... [R]emoval of a student for regular education and placement in a private, special education school is warranted only when "the nature or severity of the [student's] special needs is such that education in regular classes with the use of supplementary aids and services cannot be achieved satisfactorily". 603 CMR § 118.... Frank ... has made significant progress in a substantially mainstream program. The parents' concerns about independent activity of daily living and community skills can be raised in future team meetings and addressed in far less restrictive ways than a 502.6 placement. Similarly the parents' concerns about a proposed graduation date for Frank are amenable to the negotiation, planning, and substantial student input that the weight of the evidence indicates has already taken place. In the event of a dispute about a proposed termination of special education services, the parties may ᴜse the due process procedures available through the [BSEA] ....

Admin. Rec., at 58–59.

Frank's parents appealed the BSEA decision to the United States District Court,[11] claiming that the Hearing Officer erred in ignoring graphic testimony about Frank's poor judgment, lack of survival skills, self-endangering behavior and social immaturity. They maintain that "their son's high academic achievements and classroom performance distracted the Hearing Officer from properly considering whether [Frank] would ever reach maturity as a responsible, productive, and independent individual," which they insist is "the implicit goal of every child's education." Reply Brief, at 3. Finally, they

contend that it was error for the Hearing Officer to disregard the testimony of the Pine Ridge staff and to fail to give full consideration to their closing arguments.

By agreement of the parties, the case was heard by Magistrate Judge Alexander. See 28 U.S.C. § 636(c)(1). The Magistrate Judge affirmed the BSEA's decision, holding that "it is not the responsibility of the Commonwealth to ensure that Frank develops to his full potential." Accordingly she found the 1995–1996 IEP for Frank adequate "as guaranteed by state and federal law." June 13, 1997 Order, at 6.

Appellants argue that the Magistrate Judge committed error by conflating the federal with the more stringent state IDEA standard. See *Roland M. v. Concord School Committee*, 910 F.2d 983, 989 (1st Cir.1990). They ask that this court reverse the decision of the Magistrate Judge, set aside the decision of the BSEA, and retain jurisdiction of the case.[12]

## LEGAL STANDARD

### Standard of Review

The parties elected to proceeded before the Magistrate Judge pursuant to 28 U.S.C. § 636(c)(1). Section 636(c)(4), at the time of the parties' election, permitted an appeal of the Magistrate Judge's decision to a district judge. In this circumstance, a district court is to review the Magistrate Judge's decision for clear error. *Roland M,* 910 F.2d at 990. It is apparent that the Magistrate Judge failed to differentiate the more strict Massachusetts IDEA standard from the less stringent federal mandate.[13] Under IDEA, a state is permitted to adopt a more exacting standard than the one man-

**11.** This right of appeal is guaranteed by § 1415(e) of the IDEA.

**12.** Jurisdiction would be retained for purposes of determining whether Frank's parents were entitled to be reimbursed for his Pine Ridge tuition for the 1996–1997 as well as the 1995–1996 school year.

**13.** Magistrate Judge Alexander stated in her decision that:

[t]he First Circuit has interpreted the "adequate and appropriate" language to only require that the state provide "some" educational benefit to the child. *Lenn,* 998 F.2d at 1086.

The benefit conferred need not meet the highest attainable level or the child's maximum potential. Rather, [it] simply must fulfill the federal mandate that the child be afforded a free adequate education. *Roland M. v. Concord School Comm.,* 910 F.2d 983, 987 (1st Cir.1990).

Given the adequacy standard of reviewing an IEP, and the due deference afforded the BSEA, this Court finds no legal error in the BSEA's decision that the IEP was adequate to meet Frank's needs.

June 13, 1997 Order, at 4.

dated by federal law. Massachusetts has done so. See M.G.L. c. 71B, § 2. Under Massachusetts law, an IEP must provide for the child's maximum possible development, not merely for an "adequate" education.

## DISCUSSION [14]

 The IDEA requires that a district court make an independent assessment of the merits of a plaintiff's claims. *Roland M.*, 910 F.2d at 989. The Court of Appeals for the First Circuit expects that a district court will

> rely primarily on the administrative record ... scrutiniz[ing] the agency action for procedural regularity and substantive validity, but will not impose [its] view of preferable methods on the state agency. ... Thus the "character of the hearing" under Section 1415(e)(2), like that of the hearing conducted under the Massachusetts statute is essentially "one of review."

*Amann v. Town of Stow*, 991 F.2d 929, 932 (1st Cir.1993) (internal citations omitted). In the course of this review, "the persuasiveness of a particular administrative finding ... is likely to tell the tale." *Lenn v. Portland School Committee*, 998 F.2d 1083, 1087 (1st Cir.1993). Thus, the record of the administrative proceedings must be given "due weight." Id. See also *G.D. v. Westmoreland School District*, 930 F.2d 942, 945 (1st Cir. 1991). "Where the evidence permits two plausible views of adequacy/appropriateness, the agency's choice between them cannot

lightly be disturbed." *Roland M.*, 910 F.2d at 994. The "court's focus is upon the educational program which finally emerges from the administrative review process, not the IEP as originally proposed." *Roland M.*, 910 F.2d at 988.[15] Plaintiffs bear the burden of proving by a preponderance of the evidence that IDEA's standards were not met. *Roland M.*, 910 F.2d at 991.

 At a minimum, IDEA obligated the District to develop an IEP that was "reasonably calculated to enable the child to receive educational benefits." *Board of Educ. of the Hendrick Hudson Central School Dist. v. Rowley*, 458 U.S. 176, 206–207, 102 S.Ct. 3034, 73 L.Ed.2d 690 (1982).[16] But, as previously observed, Massachusetts law requires more. A Massachusetts IEP must be reasonably calculated to assure the child's *maximum* possible development in the least restrictive environment. Id.[17] See also *David D. v. Dartmouth School Committee*, 775 F.2d 411, 423 (1st Cir.1985).

### Frank's 1995–1966 IEP: The Record

Plaintiffs maintain that the record evidence does not support the Hearing Officer's finding that the District's 1995–1996 IEP was adequately designed to assure Frank's maximum possible development in the least restrictive environment. It is apparent from the pleadings, Mrs. S.'s testimony, and the focus of counsel at the BSEA hearing, that the primary reason Frank's parents' rejected his 1995–1996 IEP was its failure to include,

14. While nothing would prevent remand of the case to the Magistrate Judge for reconsideration of her decision, there is also no reason why this court, in the interests of judicial economy, should not honor the parties' request to conduct its own review of the fully-developed record. The court has had the benefit of the parties' oral arguments and further briefing.

15. The court should not view the IEP rigidly in hindsight. "An IEP is a snapshot, not a retrospective. In striving for 'appropriateness,' an IEP must take into account what was, and was not, objectively reasonable when the snapshot was taken, that is, at the time that the IEP was promulgated." *Roland M.*, 910 F.2d at 992.

16. In *Rowley*, the Supreme Court specified that providing a "free, appropriate, public education" requires

> personalized instruction with sufficient support services to permit the child to benefit

educationally from that instruction. Such instruction and services must be provided at public expense, must meet the State's educational standards, must approximate the grade levels used in the State's regular education, and must comport with the child's IEP. In addition, the IEP, and therefore the child's individualized instruction, should be formulated in accordance with the requirements of the Act and, if the child is being educated in the regular classrooms of the public education system, should be reasonably calculated to enable the child to receive passing marks and advance from grade to grade.

Id., at 203–204, 102 S.Ct. 3034.

17. The "least restrictive environment" test is derived from the preference of the IDEA for mainstreaming handicapped children. *Roland M.*, 910 F.2d at 987.

in their view, an adequate plan to enable Frank to cope with his imminent graduation. Frank's mother testified that she

> didn't feel the services were helpful enough to Frank. Frank had had a very difficult time, you know, getting his homework done and assignments and things like that, organizing himself, was not making progress socially or with regards to efficiency. And I was very concerned about it because I felt he was not going to be ready to graduate, would not be able to hold a job or take care of himself in an independent way.
>
> So I wanted to have a transition plan that would recognize the fact that he is not going to be ready to graduate with his peers and that he would need additional services.

Admin. Trans., at 3–149 to 3–150. More specifically, she testified that

> [a] transition plan basically was the thing that was not included.... Plus levels of his—current levels of functioning. I wanted his social skills to be addressed, and I wanted those to be incorporated in the criteria for graduation. I wanted his graduation year to be changed in acknowledgment of our discussions that we had been having to do with the transition plan.

Id., at 3–181 to 3–182.

\* \* \* \* \* \*

Q. What do you mean by a "transition plan?"

A. I wanted a plan that would be attached to [the IEP] that would indicate that Frank has ongoing needs that would have to be met first in his educational setting and eventually with help from adult social services agencies.

Q. Even though you didn't expect Frank to graduate for several years?

A. I expected that Dennis–Yarmouth would acknowledge the fact that he had difficulties which would prevent him from moving around in the community in an independent way. And that it should be up to the school to provide him with services to help him become an independent person who could take public transportation, so that he could learn to drive, so that

he could learn to make friends, protect himself from dangerous people, things like that.

Id., at 3–185.

\* \* \* \* \* \*

Q. Have you told us now about everything you wanted in the IEP, referring to S–4, that isn't in there?

A. I don't know.

Q. Take a minute and think.

A. I wanted somebody to teach Frank organizational skills, how to organize himself, how to get up in the morning, get dressed, organize his belongings, get himself to school on time. And then when he got home I wanted somebody to teach him how to organize the rest of his day and help him to get to places more independently, because he was relying totally on me. Very often he couldn't even attend his activities after school because he had so much homework and was so inefficient at getting it done. It's like he needed somebody with him 24 hours a day, and that person ended up being me when he wasn't in school. I'm just not qualified or able to give him the structure that he needs day in and day out at the age he's at now.

Id., at 3–188 to 3–189.

Peter Regan, the administrator of special education at Dennis–Yarmouth, testified that Frank's 1995–1996 IEP listed June 1996 as Frank's "expected" graduation date. While the District believed that Frank had the ability to attend college, it was not insistent that Frank graduate with his classmates. Regan testified that he spoke

> directly and exactly [to Frank's parents] as did everybody who met at a very serious meeting we had, to say there was no demand on the school's part that Frank had to graduate in 1996. In fact we made alternative suggestions. The fact is that Frank would not be able to graduate in 1996 in any case, because the parents indicated to me and to the high school that they were not going to have him do an

American history requirement which ... would not allow his graduation.

Admin. Trans., at 26.

In response, Frank's parents asked whether Frank could participate in senior week activities and the graduation ceremony with his peers, while remaining at Dennis–Yarmouth another year. Regan conveyed the request to the Dennis–Yarmouth principal, Curtis Collins. Principal Collins rejected the proposal as contrary to school policy. "We have never allowed any students in my eleven years at Dennis–Yarmouth Regional High School to receive a blank diploma at our ceremony. To me graduation is a public statement that those students participating have fulfilled all academic requirements and have met the necessary standards for a diploma." Admin Rec., at 485. Collins's successor, "Tom Lemond ... confirm[ed] the same policy under his direction." Admin. Trans., at 5–38.

Regan further explained that the District had not modified the IEP by developing a "transition plan" because Frank's parents had been uncertain about whether they wanted Frank to remain at Dennis–Yarmouth. Admin. Trans., at 35–36. Regan noted that at the same time that Frank's parents had begun asking about a transition plan for Frank, they had also requested that the District provide a counselor to advise Frank on a choice of colleges. Id., at 36.

Leslie Scott, the chair of special education at Dennis–Yarmouth, testified as follows regarding efforts to develop a transition plan for Frank.

Q. Did Mrs. S. request anything from you during the spring of 1995 relative to transitional planning for Frank?

A. Yes, she did. She had mentioned in one of our phone calls that somebody had come the previous year at their annual review—I was not at the school at that time so I don't know—but she mentioned the Department of Mental Retardation and Nancy Redosovik. And when I spoke to her on the phone she had said that she wanted to get that agency/team involved, and I told her at that time that Frank would not be eligible for that program, because

there are certain guidelines, but there are other agencies, and so we talked about getting that transition 688 referral form. I also spoke to Nancy Redosovik directly regarding the [parents].

Q. Who is she?

A. She's a person from the Department of Mental Retardation who has contact with the schools. She comes down and helps with the 688 transition plan.

Q. And what was your conversation with her?

A. That she said that Frank would not be eligible, that his scores were too high; that she remembered the information she had gotten from the meeting the year before from the person that was there at the meeting—I don't know if it was her or not—and that he would not be eligible for DMR's services, but that there may be another agency. And so she suggested—told me the form, and that form was sent out, the 688 referral form was sent to Mrs. S.

Q. The form you're referring to is a Bureau of Transitional Planning, Chapter 688 student referral form?

A. Correct.

Q. And what's the purpose of that form?

A. To get agencies involved in the planning for transition services after High School.

Q. I'm showing you a document, and I would ask if you can identify it.

A. (Witness reviews document) Yes. This is the second student referral form that I had sent out to the [parents] to complete for Frank.

Q. And the date on the first line at the top right?

A. Was May 19, 1995.

Q. Is that when you sent that form to Mrs. S.?

A. Yes.

Q. Had you sent a similar form previously to Mrs. S.?

A. Yes, I had. It never was returned back to me.

Q. When did you send that?

A. After our phone call. I have to look back. We had the phone call on March 27th, so I would say within a day or two of that date that I sent the first one out to Mrs. S., and it was never returned to me to then release the information to the Bureau of Transitional Planning.

Q. So you prepared a second form?

A. Correct.

Q. And you sent the second form out on—

A. May 19th.

Q. And do you know when you received it back, if you did?

A. Well, it's dated July 5th. I never received it, I believe Mr. Regan received this.

Admin. Trans., at 5–17 to 5–20.

According to Ms. Scott, a TEAM meeting was held on March 30, 1995, to discuss the draft of Frank's 1995–1996 IEP. Admin. Trans., at 5–12. Mrs. S. made some suggestions which Meg Lynch, a speech-language pathologist and Frank's TEAM leader, added to the draft.[18] Admin. Trans., at 4–92 to 4–94.

Ms. Lynch testified on the subject as follows:

Q. Did Mrs. S. make suggestions to you of things she wanted included in Frank's IEP?

A. Yes, she did.

Q. Do you recall any suggestions she made that you did not include?

A. No. In fact, the first draft of the IEP was written in longhand, and I really—and it was a draft copy, as I said. And I really expected, you know, I expected it to have lots and lots of additions. The notes, that I still have, ask the things that I had added that I've highlighted in my copy of the IEP she wanted added were added. She wanted a comment about Frank's bouts of depression and how they impact his learning, and that teachers and personnel needed to be aware of his needs and how they affected his performance in school. And I had not included that in the original explanation, so I added that.

She wanted more specification about the after-school tutorial, that it would be provided for five one-hour sessions per week and that it would be arranged between mutually convenient times between the parents and tutor. It was to focus on time management, organizational skills, prioritizing, and beginning and completing homework.

That somehow she really felt at a loss with Frank. She wanted out of that role, which I can certainly understand, and wanted someone to help get him going on that.

Also, and this, I believe, related to the Sylvan Learning Center, when he was getting tutoring at Sylvan during the honors level class, it had been explicitly asked of Sylvan that they not tutor him in Honors English; that was not the purpose of their tutoring. The purpose of tutoring was to help him with the things I mentioned, organizational skills, setting assignments so he could get through them in pieces and not be overwhelmed by the whole thing.

So Mrs. S. wanted a statement that reflected this, the content of his academic classes unless otherwise specified may be used for tutoring sessions. Once he was no longer in the Honors English, there was discussion that it was totally appropriate to use his current academic classes that needed modifications because of his disability.

You know, but an honors level course—even though modifications were made by Ms. Luccock, technically special needs students don't end up in honors level courses in their disability area. Does that make sense?

---

18. Meg Lynch provided Frank with speech-language therapy in the first, third, fourth and fifth grades. She also participated in the development of his IEP's for those years. Admin. Trans., at 4–61 to 4–62. Ms. Lynch was again assigned as Frank's speech pathologist in the eleventh grade and served as his teacher liaison and the leader of his special education TEAM. Id., at 4–91.

Q. Did Mrs. S. make any other requests or suggestions?

A. No, not during that time. Yesterday I heard her refer to things like the driver's ed., having girls involved in the social language groups or social language group, the job coaching. I have no memory of that being mentioned when we were devising this IEP at all.

Admin. Trans., at 4–92 to 4–94.

Leslie Scott also testified regarding Mrs. S.'s IEP requests.

Q. Referring back to the process of developing Frank's proposed IEP for the 1995–96 school year, is there anything that Mrs. S. requested to be included in that IEP that you did not include, that the team did not include in the IEP?

A. No.

Q. Did Mrs. S. mention during any of those meetings held to develop the IEP that she wanted Frank to receive special education driver training?

A. No.

Q. Did she ever mention that she wanted additional services relative to Frank's social skills?

A. No.

Q. If she had requested additional services relative to Frank's social skills, what services, if any, could you have provided to Frank?

A. Presently I'm running two social skills groups at D–Y High School; and if parents are requesting, or teachers or whomever feel that there's a need, then I certainly could be providing social skills groups for other students.

Q. What is the purpose of a social skills group?

A. To work on changing behavior in a more positive direction, of students interacting with peers, interacting with adults, preparing them for job interpersonal relations, and so forth....

Q. So what could you have done to assist Frank in terms of a social group?

A. I would have started a third group with students that would be more appropriate together in a group. And I have a couple, as a matter of fact, right now that it could be feasible that it would be an appropriate group, the makeup of the group.

Admin Trans., at 5–15 to 5–17.

Meg Lynch presented the revised IEP to Mrs. S. on May 1, 1995. A follow-up TEAM meeting was held on May 15, primarily to discuss Mrs. S.'s concerns regarding Frank's performance in English 11 and participation in English 12. Admin. Trans., at 5–14. After some further communications regarding Frank's senior schedule and possible transitional services, the parties met for a mediation. Id., at 5–14, 5–19.

Mrs. S. testified that "during the mediation I had discussed that I was thinking of private placement for Frank because of the fact that he needed so much help socially." Admin. Trans., at 3–156. Frank's parents also spoke to Dr. Mishkin regarding the appropriateness of a residential school for Frank. Id., at 3–156, 4–139 to 3–140. Thereafter, without notice to the District or any further effort to develop a transition plan, they unilaterally enrolled Frank at Pine Ridge.[19] Id., at 3–158.

*Frank's 1995–1996 IEP: Analysis*

■ Frank's parents make three specific complaints about Frank's 1995–1996 IEP and an additional complaint that is really directed at the District's policy concerning graduation exercises. The parents first claim that the IEP did not address Frank's difficulties with organization and homework. This is simply

19. IDEA mandates that "during the pendency of any proceedings conducted pursuant to [§ 1415], unless the State or local educational agency and the parents or guardian otherwise agree, the child shall remain in the then current educational placement for such child." 20 U.S.C. § 1415(e)(3). Parents who " 'unilaterally change their child's placement during the pendency of review proceedings, without the consent of state or local school officials,' ... are entitled to reimbursement only if ... the public school placement violated IDEA and the private school placement was proper under the Act." (citations omitted). *Kathleen H. v. Massachusetts Department of Education,* 154 F.3d 8, 1998 WL 552995, at *1.

incorrect. The 1995–1996 IEP stipulated that

> [a]fter school tutorial will be provided for up to five one hour sessions per week. This tutorial will be arranged at a mutually convenient time between parent and tutor to focus on: time management; organizational skills; prioritizing of time and assignments; and beginning and completing homework.

In previous years, the District had arranged private after-school tutoring for Frank with teachers from Dennis–Yarmouth. However, Mrs. S. objected to that arrangement because it precluded Frank from participating in after-school activities. In response, the District funded after-school tutoring for Frank at Sylvan Learning Center which could be scheduled at his convenience. As Mrs. S. herself testified, the Center primarily worked with Frank on "basic skills, reading comprehension and writing, organization, using a notebook, and time management." Admin. Rec., at 3–193.

The parents next complain that they wanted Frank's current levels of functioning assessed and discussed in the IEP. The District sought to comply. In June of 1995, Leslie Scott administered Frank the Test of Written Comprehension, the Test of Written Language, and the social studies and science portions of the Woodcock–Johnson Psycho–Educational Battery. Admin. Rec., at 455; Admin. Trans., at 5–7 to 5–10. Frank's parents, however, enrolled him at Pine Ridge before any further revision of the IEP could be made.

The parents next fault the District's efforts to arrange summer of 1995 employment for Frank. The District placed Frank (as it had during the three previous years) in the Job Training Employment Corporation (JTEC). Frank was assigned a job at intelligent Labeling Technologies. Admin. Rec., at 448. Frank testified that he was laid off after several weeks as the company did not have enough work to keep him busy. Admin. Trans., at 81–82. The parent's final complaint regarding the District's refusal to permit Frank to participate in a mock graduation ceremony raises an issue of discretion-ary school policy which is beyond the educational concerns of IDEA.

Under the circumstances, I agree with the hearing Officer that the virtues of Pine–Ridge as an alternative placement to Dennis–Yarmouth are irrelevant, as the parents have failed to meet their burden regarding the 1995–1996 IEP's alleged deficiencies. The responsibilities that Frank's parents sought to place on the District exceeded even the very stringent demands imposed by Massachusetts law. The District had given Frank an exemplary education in a supportive environment sensitive to his special needs. The parties agree that Frank succeeded academically in this environment. Frank's parents' expectation that the District would be able to mold Frank into "a responsible and independent individual capable of interacting with the material and social world around him," Appellants' Memorandum, at 16, while understandable, was unreasonable, given Frank's innate disabilities. The District's responsibility was to exert its best efforts to maximize Frank's *possible* developmental potential. I see no evidence that it did less.

### ORDER

For the foregoing reasons, the decision of the BSEA is *AFFIRMED*.

SO ORDERED.