**DOUGLAS W. by DOUGLAS and SUSAN W., his parents, Plaintiffs,**

v.

**GREENFIELD PUBLIC SCHOOLS and the Massachusetts Department of Education, Defendants.**

No. Civ.A. 00–30204–KPN.

United States District Court, D. Massachusetts.

Sept. 5, 2001.

Marilyn Schmidt, Schmidt & Botter, Northampton, MA, for Plaintiffs.

Peter L. Smith, Paroshinsky Law Offices, Springfield, MA, Dorothy Varon, Atty. Gens. Office, Springfield, MA, for Defendant Greenfield Public Schools.

Bart Q. Hollander, Office of Atty. Gen., Springfield, MA, Peter L. Smith, Paroshinsky Law Offices, Springfield, MA, Dorothy Varon, Atty. Gens. Office, Springfield, MA, for Defendant Mass. Dept. of Educ.

*MEMORANDUM WITH REGARD TO THE PARTIES' CROSS MOTIONS FOR SUMMARY JUDGMENT (Docket Nos. 20, 37)*

NEIMAN, United States Magistrate Judge.

Douglas W. ("Douglas"), through his parents Douglas and Susan W. ("par-ents"), (collectively "Plaintiffs"), appeals from a decision of the Bureau of Special Education Appeals ("BSEA") of the Massachusetts Department of Education ("Department"). The BSEA hearing officer found that the individual education plan developed for Douglas for the 1999–2000 school year by the Greenfield Public Schools ("Greenfield") could have been implemented to assure his maximum possible educational development within the least restrictive educational environment. Accordingly, the BSEA hearing officer denied the parents' request for reimbursement for the costs of Eagle Mountain, a private school into which they unilaterally placed Douglas at the beginning of that same school year.

Greenfield and the Department (collectively "Defendants"), together with Plaintiffs, have consented to this court's jurisdiction pursuant to 28 U.S.C. § 636(c). Presently before the court are the parties' cross-motions for summary judgment.[1] For the reasons which follow, the court will affirm the BSEA decision and, hence, allow Defendants' motion for summary judgment and deny Plaintiffs' cross motion for summary judgment.

I. LEGAL OVERVIEW

In order to receive certain federal funding, states are required under the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. § 1400 et seq., to provide children with a "free appropriate public education," otherwise known as a "FAPE," in the least restrictive environment. *See* 20 U.S.C. §§ 1400(c), 1412(a)(1) and 1412(a)(5). *See also Kathleen H. v. Mass. Dep't of Educ.*, 154 F.3d 8, 10 (1st

---

1. The court treats the Department's motion for summary judgment as applicable to both it and Greenfield.

Cir.1998) (citing 20 U.S.C. § 1400(c)). A FAPE is defined as "special education and related services." 20 U.S.C. § 1401(8). A child in need of such special educational services is entitled to an individual education plan ("IEP"), the responsibility for which is placed on the local educational agency ("LEA"), 20 U.S.C. § 1401(15), here Greenfield. *See Thomas R.W. v. Mass. Dep't of Educ.*, 130 F.3d 477, 478–79 (1st Cir.1997). Parental participation in the development of the IEP is essential to its validity. *Matthew J. v. Mass. Dep't of Educ.*, 989 F.Supp. 380, 387 (D.Mass.1998).

■ Although Massachusetts law parallels the IDEA, it reflects a more exacting standard. *See* Mass.Gen.L. ch. 71B, § 2. "A Massachusetts IEP must be reasonably calculated to assure the child's *maximum* possible development in the least restrictive environment." *Frank S. v. Dennis–Yarmouth Reg'l Sch. Dist.*, 26 F.Supp.2d 219, 226 (D.Mass.1998) (citing cases) (emphasis in original). It is not enough for the LEA to simply provide for an adequate education. *See id.*

■ A child's FAPE is usually provided either in a public school or in a private school mutually chosen by school officials and the child's parents. *See Florence County School District Four v. Carter*, 510 U.S. 7, 12, 114 S.Ct. 361, 126 L.Ed.2d 284 (1993). If, however, school officials and parents do not agree on a child's IEP and the parents unilaterally place their child in a private school, the IDEA authorizes a court to order school authorities to reimburse the parents the costs thereof if it "ultimately determines that such placement, rather than a proposed IEP, is proper under the [IDEA]." *School Comm. of Burlington, Mass. v. Dep't of Educ.*, 471 U.S. 359, 369, 105 S.Ct. 1996, 85 L.Ed.2d 385 (1985). Thus, parents who unilaterally change a child's placement while in the midst of challenging a proposed IEP run the risk of a court determining that the placement is not proper. *See id.* at 373–74, 105 S.Ct. 1996.

## II. Background

Douglas was born on May 19, 1992. The IEP at issue covers his second grade education for the 1999–2000 school year. Plaintiffs describe Douglas as a child of average intelligence who, at all relevant times, carried at least two diagnoses: attention deficit hyperactivity disorder, combined type ("ADHD"), and mixed receptive-expressive language disorder ("Dyslexia"). A third diagnosis, an adjustment disorder with mixed disturbance of emotions and conduct, was later proffered by Dr. Warnie L. Webster, a psychiatrist, during the course of the administrative hearing challenging the IEP.

Douglas was recognized as having the first two diagnoses when he was in kindergarten. As a result, an IEP was developed for his first grade at Greenfield's Federal Street School ("Federal Street"). That IEP called for fifteen minutes of psychological and educational consultation services twice a month as well as thirty minutes of speech and language therapy and forty-five minutes of academic special education services three times per week. Douglas also took five milligrams of Ritalin twice a day during the first grade to treat his ADHD.

The description of Douglas' progress during first grade varies somewhat between the parties. His parents describe him as having had trouble communicating with his peers and note that he often told his teacher that he could not do an assignment, sulked in class and had trouble completing his homework. Moreover, they point out, a reading program had to be extended beyond the usual twenty weeks because Douglas had only achieved Level 8 and, by June, had achieved only Level 10.

(Apparently, Douglas needed to achieve Level 16 to be ready for second grade.) Defendants, in contrast, maintain that Douglas' first grade report card showed progress in reading, language and spelling.

On June 2, 1999, at the end of the school year, Douglas' parents met with his special education "TEAM." [2] Included in Douglas' TEAM were his first grade teacher, a school psychologist and a special education teacher, Sharon Murphy Jones. Although Douglas' mother agreed with the TEAM that her son had made progress during the first grade, she was concerned about continuity and communication amongst the various TEAM members. She also mentioned the "huge issue" of Douglas' low "self esteem" and the fact that he still exhibited "an awful lot of frustration, a lot of avoidance behavior and a lot of feelings of self worthlessness." (Administrative Record ("A.R."), Vol. II (Docket No. 6) at 39.)

In any event, the development of Douglas' second grade IEP was postponed until his parents received the results of an evaluation undertaken, at their request, by the Tufts New England Medical Center ("Tufts"). The Tufts evaluation, which had been scheduled by the parents in March of 1999 and which was funded by Greenfield, was not conducted until late June. It included neuropsychological, speech, language and educational analyses by various specialists. As part of the Tufts evaluation, Douglas' first grade teacher completed an extensive questionnaire describing Douglas' progress and classroom behavior.

On or about July 15, 1999, the results of the Tufts evaluation were shared orally with Douglas' parents. They understood Tufts as recommending that Douglas be placed in a substantially separate language-based classroom and be given regular speech and language therapy.

Soon thereafter, Douglas' mother had several conversations with Ms. Murphy Jones, the details of which were described in Ms. Murphy Jones' testimony:

Q. [Greenfield's Counsel]: Did you have conversations with the parents during the Summer of 1999, during the period of waiting, prior to the receipt of the Tufts evaluation?

A. Prior to my receiving it?

Q. Yes.

A. Yes.

Q. Can you describe to the hearing officer what those conversations were?

[HEARING OFFICER:] And when.

A. There were several conversations throughout the Summer. Susan would phone me at home. She was very worried about Douglas. She was very worried about what they found at Tufts, that she felt that the severity of his language disability and attention problems combined with his emotional state. She was worried about those issues in particular.

Q. And what was your response?

A. I did a lot of listening, a lot of reflective listening, and told her that we would reconvene the team and write a plan that would address Douglas' needs.

Q. Did you tell her that Greenfield did not have a language based program?

A. I told her that we did not have a language based self contained substantially separate program, yes.

(A.R., Vol. III (Docket No. 7) at 478–79 (emphasis added).) At least in part, these conversations motivated the parents to enroll Douglas in Eagle Mountain prior to a

---

2. Under federal and Massachusetts law, the term "TEAM" describes a group of individuals who develop, review and revise the provisions of an IEP. *See Roland M. v. Concord Sch. Comm.*, 910 F.2d 983, 988 (1st Cir.1990) (and regulations cited therein).

TEAM meeting scheduled for September 9, 1999. Only after the parents applied and tendered a tuition check to Eagle Mountain did they notify Greenfield of their decision.[3]

Notwithstanding the parents' unilateral placement of Douglas into Eagle Mountain, the TEAM met, as scheduled, on September 9th. The purpose of the meeting was to consider Tufts' written report, copies of which Plaintiffs and Greenfield had received in late August. A new IEP was developed at the meeting and forwarded to the parents on September 20, 1999.

In essence, the new IEP called for Douglas to attend a mainstream classroom at Federal Street with regular second grade students, but to receive specialized services in speech, language, reading and writing. According to the IEP, Douglas was to leave his regular classroom for special education for nearly two and one-half hours (145 minutes) per day. The IEP also included sixteen goals with multiple objectives, as well as consultations with the special education teacher, a speech and language pathologist, the school psychologist and a reading specialist. In addition, the IEP called for bi-monthly meetings to ensure a cohesive program. (A copy of the IEP can be found at pages 14 through 40 of A.R. Volume V. (Docket No. 9).)

The parents rejected the IEP on October 20, 1999, and filed an appeal with the BSEA. An administrative hearing was held over the course of four days in June and July of 2000. The 1,400–page, six-volume administrative record includes a transcript of over 800 pages. The remaining record is comprised of numerous exhibits, motions and rulings, together with a thirty-page decision of the hearing officer, Joan D. Beron. The parties have not requested the court to consider any other evidence.

In her decision, the hearing officer described the three issues before her:

I. Can Greenfield's proposed ... IEP ... for the 1999–2000 school year ... be implemented to assure [Douglas'] maximum possible educational development within the least restrictive educational environment?

II. If not, [does] ... Eagle Mountain ... offer [Douglas] a FAPE in the least restrictive environment?

III. If so, are [Douglas'] Parents entitled to tuition reimbursement and reimbursement for private speech/language therapy incurred as a result of their unilateral placement of [Douglas] at Eagle Mountain?

(A.R., Vol. I (Docket No. 5) at 111.) A footnote to this recitation indicates that the parties had stipulated that Greenfield's IEP, with some minor exceptions, incorporated the recommendations of the Tufts evaluators. (*Id.* at 111 n. 2.)[4] The essence

---

3. Ms. Murphy Jones continued to testify as follows:

> Q. Now, did you discuss anything in terms of Eagle Mountain School with the parents?
> A. The parents were exploring Eagle Mountain at that point.
> [HEARING OFFICER]: How do you know that?
> A. They mentioned it. They mentioned Eagle Mountain on the phone to me.
> Q. During the Summer of 1999?
> A. Yes.
> Q. When during the Summer?

> A. I don't remember particularly. It was prior to our meeting on the Tufts evaluation, it was prior to my receiving it.
> Q. Did you discuss Eagle Mountain with the parents?
> A. I didn't know anything about the program at the time so I would not have.
> Q. Okay.

(A.R., Vol III at 480–81.)

4. The footnote also states that Plaintiffs stipulated that the IEP was appropriate. However, it appears that Plaintiffs only acknowledge that the IEP facially restated most of the

of the dispute, therefore, was "whether [Douglas'] needs must be met in private day placement for language disabled students." (*Id.*) The hearing officer's decision goes on to describe the parties' respective positions with respect to that dispute, to profile Douglas' psychological and educational history, and to set forth findings and conclusions.

In her findings, the hearing officer, relying on the views of various witnesses, described the type of inclusion program which would be appropriate for Douglas. Then, after attributing varying weight to the witnesses' opinions, she concluded that the IEP offered by Greenfield would assure Douglas' maximum possible educational development within the least restrictive educational environment. Accordingly, she denied the parents' request for reimbursement for Douglas' tuition at Eagle Mountain. Although she indicated that there was no need to address the second issue, she also concluded that, despite good intentions, the Eagle Mountain program did not meet federal standards of appropriateness.

### III. STANDARD OF REVIEW

In an action brought under the IDEA, "the court (i) shall receive the records of the administrative proceedings; (ii) shall hear additional evidence at the request of a party; and (iii) basing its decision on the preponderance of the evidence, shall grant such relief as the court determines is appropriate." 20 U.S.C. § 1415(i)(2)(B). The court does not, however, have "an invitation ... to substitute [its] own notions of sound educational policy for those of the school authorities which [it] review[s]." *Board of Educ. of Hendrick Hudson Cent. Sch. Dist. v. Rowley*, 458 U.S. 176, 206, 102 S.Ct. 3034, 73 L.Ed.2d 690 (1982). Rather, the court must give the state administrative proceeding "due weight." *Id. See also Lenn v. Portland Sch. Comm.*, 998 F.2d 1083, 1087 (1st Cir.1993).

To accomplish its task, the court must apply "an intermediate standard of review[,] ... a standard which, because it is characterized by independence of judgment, requires a more critical appraisal of the agency's determination than clear-error review entails, but which, nonetheless, falls well short of complete de novo review." *Lenn*, 998 F.2d at 1086. This standard must be applied against the traditional summary judgment standard. *Norton Sch. Comm. v. Mass. Dep't of Educ.*, 768 F.Supp. 900, 904 (D.Mass.1991).

### IV. DISCUSSION

In order for Plaintiffs to be entitled to reimbursement of the costs of their unilateral placement of Douglas at Eagle Mountain, they must prove "both that the public placement violated IDEA and that the private school placement was proper under the Act." *Florence County Sch. Dist. Four*, 510 U.S. at 15, 114 S.Ct. 361. In Massachusetts, the first prong asks "whether the IEP addresses the child's special educational needs so as to assure his maximum possible development in the least restrictive environment consistent with that goal." *Roland M.*, 910 F.2d at 991. The burden of proof at all times lies with Plaintiffs. *See id.* (citing cases). Thus, if Plaintiffs are unable to convince the court to overturn the hearing officer's decision with respect to the first prong, the court need not undertake an analysis of the second. Again, the hearing officer found that Plaintiffs bore neither burden.

### A. THE FIRST PRONG: GREENFIELD'S IEP

Each of Plaintiffs' four arguments with respect to the first prong targets the hear-

services, goals and objectives recommended by Tufts. (See A.R., Vol. I at 32.)

ing officer, namely, that she (1) misapplied the required legal standard to Greenfield's IEP; (2) failed to consider Douglas' "anxiety" before accepting the IEP as appropriate; (3) erred in adopting the findings and recommendations of two teachers in lieu of the Tufts experts presented by Plaintiffs; and (4) erroneously approved the IEP even though Douglas would not be in the classroom during social studies or science in contravention of state-mandated curriculum standards. These errors, Plaintiffs conclude, demonstrate that the IEP did not assure Douglas' "maximum possible development in the least restrictive environment." The court will address Plaintiffs' arguments in turn.

1. *Whether the Hearing Officer Misapplied the Required Legal Standard*

■ Plaintiffs hinge their first argument on the hearing officer's reference to Greenfield's IEP as "appropriate," (A.R., Vol. I at 139), rather than utilizing the more exacting Massachusetts standard required of public placement. A dispassionate review of the hearing officer's decision, however, demonstrates beyond doubt that she not only articulated the correct standard, but properly applied it to the facts.

First, the hearing officer clearly identified the initial underlying question as whether Greenfield's proposed IEP could be implemented to assure Douglas' "maximum possible educational development within the least restrictive educational environment." This was unquestionably a correct statement of the law. *See Roland M.*, 910 F.2d at 991. *See also id.* at 987–88 (citing *David D. v. Dartmouth Sch. Comm.*, 775 F.2d 411, 423 (1st Cir.1985)).

Second, the hearing officer applied the standard to the facts. For one thing, she

provided an in-depth analysis of the benefits of inclusion, i.e., the integration of special education students into mainstream classrooms. (See. A.R., Vol. I at 136–40.) She also demonstrated a proper concern for the requirement that Greenfield provide an education "in the least restrictive educational environment." (See *id.*)[5] Finally, the hearing officer specifically recognized that Eagle Mountain, should it need to be evaluated, was not to be held to the same "maximum" development standard. (*Id.* at 139.)

2. *Whether the Hearing Officer Failed to Consider Douglas' "Anxiety"*

■ Plaintiffs acknowledge that the hearing officer understood that Douglas had been diagnosed both with dyslexia and ADHD at the time his IEP was developed. However, Plaintiffs argue that the hearing officer failed to mention that Dr. Webster, a psychiatrist with Franklin Clinical Associates, diagnosed Douglas with an adjustment disorder, one symptom of which, they claim, is "anxiety."

■ In the court's opinion, Plaintiffs' argument is unavailing for a number of reasons. First, Plaintiffs describe Douglas' "anxiety" as a pre-existing condition. However, Dr. Webster's diagnosis of "adjustment disorder" was first made six months after the IEP. (See also A.R., Vol. VI at 80 (wherein Dr. Webster notes in March of 2000 that "within the past month," Douglas was again "struggling emotionally" and had "been overwhelmed and distraught at times").) The implication, of course, is that Douglas' adjustment disorder might be attributable to his switch to Eagle Mountain, not to Federal Street. Indeed, at one point, Dr. Webster

---

**5.** The court notes that Plaintiffs do not address this latter aspect of the standard in their

motion for summary judgment.

refers to Douglas' need to recover from the "present" adjustment disorder. If the court is to concentrate on the IEP as designed in September of 1999, as Plaintiffs otherwise urge, it is a bit disingenuous for them to fault Greenfield for not considering a diagnosis which no other clinician had proffered prior to that time.[6]

To be sure, Plaintiffs also fault the hearing officer for accepting Ms. Murphy Jones' testimony as to how Douglas' classroom programs would have been modified had the IEP, as originally proposed, been implemented. This criticism, too, must be rejected. Even if Douglas' IEP was initially deficient, which the court believes is not the case, the hearing officer's focus was, as it should have been, "upon the educational program which finally emerges from the administrative process, not the IEP as originally proposed." *Roland M.*, 910 F.2d at 988. *Accord Kathleen H.*, 154 F.3d at 13.

Second, Plaintiffs' conversion of Dr. Webster's diagnosis of an "adjustment disorder" into one of "anxiety" is not supported by the record. An analysis of Plaintiffs' own citations to the administrative record, (see Docket No. 23: Plaintiffs' Memorandum of Law ("Plaintiffs' Brief") at 12 n. 45), reveals that the word "anxiety" is never used. The closest reference may be found when Dr. Webster describes the parents as having stated that Douglas was "more anxious and stressed" during the course of the first grade. (A.R., Vol. VI at 79.) However, no mention had been

made of such "anxiety" in the Tufts report upon which Greenfield originally relied.

This is not to say that the Tufts evaluators did not view Douglas as having serious problems. For example, Dr. Lois Carra opined in the report that "Douglas is very aware of and frustrated by his weaknesses," and then continued:

His ADHD, even with medication makes it hard for him to cope. He therefore becomes easily overwhelmed by his emotions and is more at risk for reacting in a more extreme way. For example, when he is frustrated and discouraged, he sometimes has felt that life is not worth living. Douglas' profile, as revealed by this evaluation, has implications for functioning in school and in life. These implications include that he suffers from so low self-esteem and he needs an intensive language-based program so that he can genuinely experience competence and mastery.

(A.R., Vol. V at 66.)[7] Dr. Carra also testified that Douglas had a "short fuse," was "overreactive," was "resistant" to difficult academic activities and engaged in detrimental comparisons of himself to others. (See A.R., Vol. II at 262–64.) Then, in answer to the hearing officer's inquiry as to how one would remedy these problems, Dr. Carra testified as follows:

A. Well, I think you have to do as much as you can to take the stress away.

[HEARING OFFICER]: And how do you take the stress away?

---

6. Susan W. herself testified that "adjustment disorder" had never been previously diagnosed and that, in any case, it was not "primary." (A.R., Vol. II at 126–27.) In this vein, she also testified that, although her son made strides at Eagle Mountain, it was "tough" moving to a small, private school from a bigger public school: "He really was having trouble getting engaged and involved

in the school and it was a transitional period for him." (*Id.* at 63.)

7. In March of 1999, Susan W. began observing Douglas banging his head, throwing himself on the floor, wetting his bed and being afraid to sleep in his own bed. However, it appears that the parents did not tell Greenfield about these incidents.

A. A more, a smaller classroom, a smaller group where everybody's got the same kinds of problems and where he wouldn't be constantly comparing himself to other children and seeing that they're able to communicate, read, write and spell more easily. To approach him using games. What I did when I was testing was I started with something visual and to kind of go in the back door and gradually get into the language tasks. To be able to switch and try, be flexible if he's refusing, to have some other things in your bag of tricks.

[HEARING OFFICER]: When you say be flexible if he's refusing something, can you give me an example of what you would do if he said I'm not doing this.

A. To pull out something that's perhaps related that may not look related to him. One of the things that they tried with him during his year at Eagle Mountain was to bring out movable letters and first he would just sort of get the box in order and then, why don't we try to teach some words, and sort of moving in that way.

(A.R., Vol. III at 286–287.) Still, the Tufts report, upon which Greenfield initially relied, did not mention "anxiety."

While the hearing officer may not have addressed the issue of "anxiety" in as much depth as Plaintiffs might have wished, it is simply inaccurate for them to claim that she failed to consider the relevant testimony. The hearing officer mentioned and relied upon the reports and testimony of both Drs. Carra and Webster. Moreover, she explicitly noted the relative success of Douglas' first grade IEP in terms of his social interaction and self esteem. Accordingly, Plaintiffs' second argument must be rejected.

3. *Whether the Hearing Officer Erred in Giving More Weight to Two of Douglas' Teachers than to Plaintiffs' Tufts Experts.*

█ Plaintiffs argue that the hearing officer gave too much weight to the testimony of Greenfield's witnesses, described by Plaintiffs simply as "teachers," while simultaneously discounting some of the testimony of the Tufts nueropsychologist and speech therapist. This was particularly inappropriate, Plaintiffs argue, because Greenfield had adopted much of the clinical findings and recommendations of the Tufts experts. Again, the one Tufts recommendation which was not adopted by Greenfield—that Douglas be "in a substantially separate class for students with language based learning disabilities" (A.R., Vol. V at 60)—lies at the heart of this case.

In some contrast to the actual report, Plaintiffs describe Tufts as recommending "a substantially separate language-based classroom with small student teacher-ratio and a homogenous population." (Plaintiffs' Brief at 19.) However, the Tufts report nowhere states that "substantially separate" means entirely "homogeneous." At most, the report states that "highly structured group interaction is essential to the language-based program" and that it is necessary for the students requiring such a program "to be placed with others of similar intellectual abilities and with similar rates of processing." (A.R., Vol. V at 60.) Given that the word "homogeneous" is not mentioned in the report, the court will rely on the language actually used.

This is not merely form over substance. It is far from clear that Plaintiffs' experts ever concluded that anything but a small, separate and homogenous population of language learning disabled children was automatically inappropriate for Douglas. Douglas' recommended placement with others of similar intellectual abilities may

not encompass a placement exclusively or entirely with children having learning-based disabilities. Accordingly, the gap between the Tufts recommendation and Greenfield's IEP, and hence the views of Greenfield's witnesses, may not be as great as Plaintiffs assert.

For example, in describing the characteristics of a "communication/language-based program," Dr. Carra lists "[a]ctivities [which] are structured to allow for interactions between children with limited language with staff or other students who provide good language and social models for language or communication." (A.R., Vol. V at 66.) Dr. Carra also testified about her recommendation that Douglas receive "language immersion," in which "[t]he format of language has to be taught explicitly and I think of it as being the primary, the priority of the lesson." (A.R., Vol. II at 258.) After first describing what she meant by that term, Dr. Carra agreed that it was possible for a child with a language disability to be immersed in language in a "mainstream" classroom. (*Id.* at 258–59.) She further testified "that the recommendations are geared towards taking care of him when he's not in the language class. So I think the assumption was *that it would be optimal inclusion* to have him in a separate class for his academics and *then I think the assumption was that he would be included with the other second graders for some other things.*" (A.R., Vol. III at 358 (emphasis added).)

Similarly, the written recommendation of Janet Pike–Botelho, Tufts' speech and language specialist, is suggestive of an "inclusive" classroom setting:

> It is recommended that Douglas participate in small group and individual language treatment three times per week provided by a speech-language pathologist. *This instruction may take place using an inclusion or pull out model. The inclusion model is suggested to facilitate use of situational activities which may enhance the meaningfulness of the goals being targeted as well as facilitate carryover.*

(A.R., Vol. V at 72 (emphasis added).) To be sure, Ms. Pike–Botelho backed off from this written recommendation somewhat when she later testified that an inclusion model might not be useful for Douglas: "I guess in my personal opinion I don't see a lot of advantages to inclusion ... For Doug's case I don't see inclusion as a good useful model for him for academic subjects." (A.R., Vol. III at 415.) However, it must be remembered that, when formulating the IEP at issue, Greenfield originally considered the Tufts report as written.

Still, while the recommendations in the Tufts report may not have been as rigid as Plaintiffs now argue, it did recommend a substantially separate language-based classroom. Nonetheless, the hearing officer saw fit to devalue the Tufts report, at least in part, because it failed to acknowledge Douglas' first grade teacher's extensive responses to a questionnaire, particularly her "positive" observations of him. At the time, the teacher had experience as a special education tutor, a special needs coordinator and a 1:1 special education aide. In addition, she was certified to teach kindergarten through third grade. Ignoring the teacher's observations, in the hearing officer's opinion, caused the Tufts' experts to skew the baseline upon which they relied.

Other TEAM members upon whom the hearing officer relied also had significant experience. For example, Ms. Murphy Jones holds a masters degree in special education, is certified in elementary and special education, spent five years teaching in a substantially separate, language-

based classroom, served as a supervisory mentor for graduate degree candidates, and has lectured on inclusion, ADD and ADHD. Dr. Francis Dufresne, an educational psychologist for Greenfield, is not only a licensed psychologist, but is certified in elementary education, school psychology, special education and guidance as well. Other members of Greenfield's TEAM have similar qualifications.

In short, to the extent that the hearing officer had to measure the conflicting testimony of the parties' respective "experts," she had more than sufficient grounds to weigh the testimony in the manner she did and is owed due deference in that regard. *See Gonzalez v. Puerto Rico Dept. of Educ.,* 254 F.3d 350, 352 (1st Cir.2001). At bottom, given the care with which the hearing officer approached her task and having reviewed her determinations, the court is reluctant to overturn her judgment. *See Roland M.,* 910 F.2d at 992. ("We think it well that courts have exhibited an understandable reluctance to overturn a state agency's judgment calls in such delicate areas—at least where it can be shown that the IEP proposed by the school district is based upon an accepted proven methodology.") (citation and internal quotation marks omitted).

4. *Whether the Hearing Officer's Decision Violated Curriculum Standards*

■ Plaintiffs' final argument with respect to the first prong takes a somewhat different tack. In essence, Plaintiffs assert that a FAPE must meet the standards of the state educational agency, *see* 20 U.S.C. § 1401(8)(B), including mandatory curriculum standards recently promulgated by the Massachusetts Department of Education, *see* MASS.GEN.L. ch. 69, § 1E. According to Plaintiffs, the IEP, if implemented, would have caused Douglas to be

out of the classroom for twelve and one-half hours per week for specialized instruction. Ergo, Plaintiffs contend, the IEP would fall short of FAPE standards.

Plaintiffs' argument is somewhat curious given that curriculum standards appear to have played no part in their rejection of the IEP. The issue arose only in the context of the hearing at the end of the 2000 school year. Granted, as Plaintiffs now contend, they were not aware of the curriculum issue at the time of their rejection. But to maintain, as they do, that the IEP was therefore inadequate as a matter of law overstates the strength of their argument, creative as it is. In the end, it cannot carry the day for several reasons.

First, although Plaintiffs aver, without qualification, that the hearing officer found that Douglas would miss social studies and science classes under the proposed IEP, she also noted that Ms. Murphy Jones could use materials from these classes and integrate the social studies and science frameworks curriculum into the reading comprehension and writing tutorial. To be sure, these adjustments, as Plaintiffs argue, might run up against curriculum standards for the arts. But, as Ms. Murphy Jones testified, it would be difficult to provide precise details about curriculum goals when Douglas never entered the second grade classroom and that, in any case, Douglas' services could be adjusted to account for his language-based disability. The hearing officer found this testimony persuasive.

Second, Plaintiffs' argument loses all remaining steam in light of the Eagle Mountain program which, although preferred by the parents for its language-based immersion, does not itself abide by Massachusetts curriculum standards. Indeed, the director of the Eagle Mountain School testified that, in particular, its curriculum falls short of these standards in science

and social studies. It may well be, as the parties seem to agree, that Eagle Mountain, as a private school, did not have to meet such standards. That fact, however, does little to support Plaintiffs' contrasting concern, offered late in the day, that Greenfield's IEP may have fallen shy as well.

### 5. *Additional Thoughts*

■ Although the court finds Plaintiffs' arguments unconvincing with respect to the first prong of the analysis, this is by no means an easy case, at least emotionally. It appears to the court that Douglas' parents, painfully aware of the significant difficulties faced by him and experiencing his emotional outbursts at home, were trying to do what they considered best.[8] But, as they knew, their unilateral placement of Douglas at Eagle Mountain was fraught with risks, both financial and educational. Those risks, which must now be assessed, arose for a number of reasons.

For one thing, there is little doubt that Plaintiffs were intent on enrolling Douglas at Eagle Mountain prior to the formulation of Greenfield's IEP. They reached their decision after receiving an oral report from Tufts over the previous summer and, as they now assert, after being told by Ms. Murphy Jones in a series of informal conversations that Greenfield "did not have a language-based program." (Plaintiffs' Brief at 20.) As described, however, Ms. Murphy Jones' statements were not so stark. At most, she indicated that Greenfield did not have "a language based *self contained substantially separate* program." (A.R., Vol. III at 479 (emphasis added).)

Perhaps more importantly, on September 2, 1999, after they had applied for Douglas' admission at Eagle Mountain, his parents met with Guy Silvester, Greenfield's Director of Special Education, and Dr. Dufresne, who had conducted a neuropsychological evaluation of Douglas. Both assured the parents that Greenfield could provide all the services identified in the Tufts evaluation except that a language-based curriculum in an integrated classroom would be utilized instead of a separate language-based classroom. Similarly, during a one-hour visit to Federal Street on September 6, 1999, Susan W. was told by Douglas' proposed classroom teacher that she was confident she could provide the services suggested in the Tufts evaluation. Despite these assurances, the parents rejected the IEP (which soon followed) even though, as they later acknowledged, it included, "[o]n its face, . . . most of the services, goals and objectives recommended by the experts from Tufts." (A.R., Vol. I at 32.)

To be sure, the parents argued before the BSEA that the reality of Douglas' educational experience, not the words of the IEP itself, was at issue. Unfortunately, neither the parents nor any of the Tufts evaluators ever "observed" the IEP because it was never implemented. In fact, neither Dr. Carra nor Ms. Pike–Botelho visited Federal Street until March 3, 2000, many months after the IEP was proposed and rejected, and observed a class that, understandably, had not been modified for Douglas. Dr. Carra herself acknowledged that this put Greenfield "at a disadvantage." (A.R., Vol III at 316.)

---

**8.** Susan W. testified as follows: "[W]e have based a lot of our decisions, or this decision to put Douglas at Eagle Mountain School because his self esteem is so important, and if you don't have your self esteem really learning doesn't really matter. If you don't feel good about yourself how can you be anything, how can you survive this world. So a lot of our decision is really based on that we love our little boy and we want him to love himself." (A.R., Vol. II at 70–71.)

Similarly, Dr. Webster, who later saw Douglas at his parents' request, indicated that "it is impossible to know how Douglas would have fared with the public school IEP instead of his current placement," although she doubted that he would have made as much progress. (A.R., Vol. VI at 81.) Still, given her added diagnosis of an "adjustment disorder with mixed disturbance of emotions and conduct," Dr. Webster thought it best that Douglas continue at Eagle Mountain. (*Id.*) Indeed, "[e]ven with this continuity," Dr. Webster opined, "he is at risk." (*Id.*) Thus, once placed at Eagle Mountain, it became difficult, if not impossible, to have him return to Federal Street.

Having made the decision to place Douglas at Eagle Mountain, the parents were left with little choice but to reject and then contest Greenfield's IEP. Unfortunately for them and expectations they may have had to the contrary, the hearing officer found, given the totality of evidence, that Greenfield's IEP did indeed provide Douglas with a FAPE in the least restrictive setting. More importantly for purposes here and for the reasons described, the parents have not demonstrated that the hearing officer committed any legal error in reaching that decision. At bottom, the court finds, based on the preponderance of the evidence, that the IEP proposed by Greenfield, as polished over the course of the administrative hearing, was adequate and appropriate for Douglas. *See Kathleen H.,* 154 F.3d at 13.

**B.** *The Second Prong: The Eagle Mountain Placement*

Although the second prong need not have been reached, the hearing officer nonetheless found that Eagle Mountain was an inappropriate placement for Douglas.[9] In this regard, the hearing officer acknowledged that a private placement did not have to meet the strict requirements of a public school program. *See Matthew J.,* 989 F.Supp. at 388. Still, she explained, parents are entitled to reimbursement for a private placement only if they can prove "both that the public placement violated IDEA, and that the private school placement was proper under the Act." *Florence County Sch. Dist. Four,* 510 U.S. 7 at 15, 114 S.Ct. 361. Being "proper under the Act," the hearing officer stated, requires that the program be individualized and "reasonably calculated to enable the child to receive educational benefits." *Rowley,* 458 U.S. at 207, 102 S.Ct. 3034. "[D]espite good intentions," the hearing officer found, the Eagle Mountain program did not meet this standard. It was not sufficiently individualized, did not offer psychological services or pragmatic instruction and contained "no carryover of private speech therapy goals and objectives" nor "extended year programming to prevent regression." (A.R., Vol. I at 139.)[10]

To be sure, Plaintiffs take issue with these conclusions. The court, however, need not enter the thicket. For the reasons stated, the court is prepared to affirm

---

**9.** Eagle Mountain is housed in a small private home in a residential area of Greenfield. During the 1999–2000 school year, it had eleven students ranging from ages seven to fourteen. Prior to Douglas' acceptance, the school had not served any children younger than eight. Other than its Director, none of Eagle Mountain's five teachers, three of whom taught part-time, were special-education certified at the time.

**10.** Interestingly enough, Dr. Carra testified that, after observing Eagle Mountain, the writing and reading curricula there "weren't exactly what we had recommended." (A.R., Vol. III at 329.) Similarly, Ms. Pike–Botelho found the pace at Eagle Mountain to be "very slow." (*Id.* at 426–27.) When asked about Eagle Mountain's lack of a speech and language pathologist, she stated that "[i]t would be nice if they had one." (*Id.* at 429.)

the hearing officer's finding that Greenfield's IEP would have assured Douglas' maximum possible educational development. Accordingly, the appropriateness (or inappropriateness) of the Eagle Mountain program is, at this point in time, immaterial. *See Roland M.,* 910 F.2d at 992 ("Beyond the broad questions of a student's general capabilities and whether an educational plan identifies and addresses his or her basic needs, courts should be loathe to intrude very far into interstititial details or to become embroiled in captious disputes as to the precise efficacy of different instructional programs.").

### V. CONCLUSION

For the reasons stated, Plaintiffs' motion for summary judgment will be DENIED and Defendants' motions will be ALLOWED. A separate order shall issue.